## YARN v. FT. DODGE, D. M. & S. R. CO.*

Circuit Court of Appeals, Eighth Circuit.
March 1, 1929.

No. 8336.

William F. Riley, of Des Moines, Iowa (Addison M. Parker, Clifford V. Cox, and Donald Evans, all of Des Moines, Iowa, on the brief), for appellant.

Walter R. Dyer, of Boone, Iowa (James C. Davis, A. A. McLaughlin, and George E. Hise, all of Des Moines, Iowa, and John W. Jordan, of Boone, Iowa, on the brief), for appellee.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

McDERMOTT, District Judge. The appellant (plaintiff below) sued for personal injuries occasioned by an electric shock received directly from a steam pipe on which he was working, and indirectly from lines of the defendant. The trial court directed a verdict for the defendant, at the close of plaintiff's evidence, on the ground of lack of any duty to the plaintiff, lack of negligence, and because of plaintiff's negligence. The question of proximate cause, and the intervention of an efficient intervening cause, is also presented by the record and the briefs. The plaintiff contends that, under the proof, these questions should have gone to the jury.

The plaintiff's proof developed that the defendant owned an electric railroad and sold power and light to industries and persons near its railroad lines. Among such industries was the Bloomfield Coal & Mining Com-

*Rehearing denied May 20, 1929.

pany. The plaintiff had been in the employ of the mining company for 13½ years in a clerical capacity. On January 14, 1927, there was a bad cave-in at the main shaft of the mine; it discontinued operations; from the middle of February until April, the plaintiff worked in the mine, for the company, helping salvage the underground equipment; in April the company sold its equipment to George Yarn, the father of the plaintiff; thereafter, and until the accident on May 23, he worked for his father, dismantling the machinery on top. The plaintiff was 35 years old, had a high school and business education, was a man of intelligence, but was not trained or skilled as to electricity. He knew that the transformers hereafter referred to were electric equipment, and had the knowledge, common to adults, that danger lurks around electric wires.

The defendant furnished current to operate the mine, bringing it in on wires of 22,000 volts, and stepping it down, through three transformers, to 220 volts. The mine sold current to 17 or 18 domestic consumers. Under this contract for current, the mining company was obligated to furnish a house for the transformers. Prior to the cave-in, these transformers, which were egg-shaped, with a long diameter of 3½ feet, and 6 or 7 feet in height, were housed in a brick house owned by the mine. The transformers are filled with an oil, and give off a humming sound, audible for several feet, when the current is on. The high-voltage wires leading into the transformers were not insulated.

The cave-in of January 14, 1927, endangered the transformer house. It was necessary to find temporary housing for the transformers, as uninterrupted current was necessary to operate the fans and for salvaging the equipment through the air shaft. The mining company having no other available place, the transformers were moved to a blacksmith shop (owned by the mining company) by the defendant's men, assisted by employees of the mine. This blacksmith shop was a one-story building about 20'x40' with 2'x6' rafters some 10'x12' from the ground. It was equipped with forges, table, and vise, and other tools. It was heated by a radiator on the north wall, the steam coming from the power house in another building some distance away, through a steam pipe coming into the shop at the rafters, thence to about the center of the shop, thence north along the rafters to the north wall, thence down to the radiator. It was supported by iron posts 10' high. Over the radiator, probably 8' high, was a platform carrying the motor for the forges, which platform concealed the roof, directly over the radiator, from one working at the radiator.

The most available place in the shop for the transformers was a little south of the radiator, leaving a passageway between the north transformer and the radiator. This required the bringing of the uninsulated high voltage wires into the building at the rafters, and thence over the transformers and down to them. Observing that these wires would be in close proximity to the steam pipe, a conductor, the steam pipe was partially dismantled, all of it being taken down except the upright from the radiator to the rafters, and a horizontal stub extending toward the transformers some 5' or 6'. One of the employees of the mine did the dismantling, assisted and steadied by one of defendant's men. This was done when the first transformer went in, and left sufficient clearance for that one; when the second and third were placed, it so shortened the clearance that this unfastened stub end of a steam pipe was within a foot or so to one side of the wires leading to the transformer, and so situated that a horizontal shift of the steam pipe would bring it into contact with the wires. The employees of the mine continued to use the blacksmith shop. No physical guards were placed about the wires or transformers.

On May 23 the plaintiff went into the shop to take down the steam pipe from the radiator. He was attempting to disconnect a valve about 4' from the ground on the upright pipe on the north wall. He loosened it with his hammer, put on a pipe wrench, and shoved, using both hands and considerable force. The pipe turned; the horizontal stub turned in an arc as the vertical pipe twisted; the stub came in contact with the wires, and very severe injuries resulted. There was expert evidence that the installation as made was not in accord with the customary and approved practice.

■ There is no serious disagreement in the briefs, and little room for disagreement as to the law applicable. The defendant is not an insurer; like all others, it is liable for failure to exercise reasonable care under the circumstances. But the care required of one installing 22,000 volt wires is different from that required of one installing steam pipes, just as the mythical "reasonable man" must drive a car loaded with cans of nitroglycerine more carefully than he need drive the same car loaded with cans of milk. But it is not necessary that he shall foresee and guard against the improbable, nor the neglect of others. However, if from the situa-

tion existing some injury is apt to result, and a like injury does result, it is no defense that the precise method of the injury was not foreseeable.

In Teis v. Smuggler Mining Co., 158 F. 260, 15 L. R. A. (N. S.) 893, Judge John F. Philips, speaking for this court, carefully reviewed the doctrine of negligence and proximate cause, and came to this conclusion: "The philosophy of the responsibility for a negligent act is that the wrongdoer is answerable for such consequences as flow directly from the act, and are such as a reasonable man should anticipate would probably result from the act first committed." "Whenever this causal connection between the negligent act and the ultimate injury is interrupted by reason of the interposition of some independent force or human agency, acting independently of the first negligent act, but for which the ultimate injury would not have come, the former is the remote and the latter is the proximate cause."

The cases were again reviewed in Davis v. Schroeder (C. C. A.) 291 F. 47, and the rule adhered to, adding to it the well-settled qualification that, if the intervening cause was itself foreseeable, it does not interrupt the chain of causation, or relieve the original wrongdoer. We quote: "From these citations the clear rule is apparent that an injury that could not have been reasonably anticipated by a person of ordinary prudence and intelligence as the probable result of the act of negligence is not actionable; nor is such injury actionable, if it would not have resulted from the alleged negligence, but for the interposition of some new and independent cause that could not have been reasonably anticipated."

The rule as to the degree of care required of one handling electricity in dangerous quantities has been recently stated by this court in Reynolds v. Iowa Southern Utilities Co., 21 F.(2d) 959: "There is no contradiction of authority as to the duty of those in control of wires conveying the dangerous agency of electricity to use a high degree of care in insulation and inspection thereof to protect those who may lawfully come in contact with said wires. The rule is concisely stated in Colusa Parrot Mining & Smelting Co. v. Monahan (C. C. A.) 162 F. 276, as follows: 'At points or places where people have the right to go for work, business, or pleasure the insulation and protection should be made as nearly perfect as reasonably possible, and the utmost care used to keep them so.' And in 20 Corpus Juris, p. 355, § 42: 'The exercise of a sufficient degree of care requires a careful and proper insulation of all wires and appliances in places where there is a likelihood or reasonable probability of human contact therewith, and the exercise of due care to make and keep insulation perfect at places where people have a right to go on business or pleasure.'"

To the same general effect, see Dierks Lumber & Coal Co. v. Brown, 19 F.(2d) 732 (8 C. C. A.); Union L., H. & P. Co. v. Arntson, 157 F. 540 (8 C. C. A.); note in 9 A. L. R. 174.

In the brief for appellee many cases are cited which state the same rule negatively. The facts in such cases required a finding for the defendant, but the same rule is adhered to, namely, that a similar or like injury should have been anticipated before there can be liability; and that an intervening efficient cause will interrupt the chain of causation, unless such intervening cause should have been anticipated. The appellee cites Davis v. Schroeder, supra, and Chicago, St. P., M. & O. R. Co. v. Elliott, 55 F. 949, where Judge Sanborn, speaking for this court, said: "An injury that is the natural and probable consequence of an act of negligence is actionable. But an injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence is not actionable, nor is an injury that is not the natural consequence of the negligence complained of, and would not have resulted from it, but for the interposition of some new, independent cause, that could not have been anticipated."

And in Johns-Manville v. Pocker (C. C. A.) 26 F.(2d) 204, Judge Booth, after reviewing the authorities, said that it must be shown "that a like injury due to the alleged negligence could have been anticipated by a reasonably prudent person."

Both parties rely upon the same rule of law, which is abundantly settled, is in accord with reason, and in support of which countless authorities might be cited. Let us apply the law to the facts, and inquire whether reasonable men might draw different conclusions from the proof offered.

On January 14, skilled workmen of defendant were called to move transformers into a temporary building, furnished by the mining company, and one in which it was apparent that employees of the mine would be in and about. They were confronted with an emergency, which is a circumstance to be considered in connection with the testimony of experts. That they did realize the danger connected with the proximity to the steam pipe is indicated by the fact that they took

down, or assisted in taking down, a part of it. When the defendant's skilled workmen came to put in the last transformer and string the wires to it, they must have seen that the stub end of this pipe, unfastened at the free end, was dangerously close to these high-voltage wires, so close that, if it were moved, by any means, a few inches, the wires would charge the pipe and the radiator.

They must, or should have, considered another thing: That stub end of the steam pipe was not a permanent fixture. The plaintiff argues that defendant knew the shop was to be dismantled, and that some one would be taking the rest of the pipe down. Whether that be true or not, it is entirely clear that the workmen must have known that some one, probably unskilled in electricity, some day before winter, at least, would either be taking the rest of that pipe down or connecting it up again. Somebody must do something with that pipe, for it was apparent to the most obtuse that it was not a permanent fixture.

The defendant then strung a 22,000-volt uninsulated wire in close proximity to a conductor, a pipe it knew some one would be working on. We believe that a jury might reasonably find that some injury was apt to follow. It did follow. It is argued that the defendant could not foresee the particular manner in which the pipe touched the wire; that is, by turning of the upright piece. But the above cases from this court show conclusively that the precise manner of the accident need not be foreseen. It should have been foreseen that some one might be burned while working on this stub end of the pipe. Some one was. That is enough.

There was an efficient, intervening cause—the turning of the vertical pipe—without which the injury would not have occurred. Much force was applied to the wrench. But the authorities all agree, many of which are cited above, that an intervening cause does not interrupt the chain of causation, if it itself was reasonably foreseeable. Again, it is not necessary that the precise intervening cause be foreseen. If careful workmen, installing these wires, should have said to themselves, "We'd better take down that stub end of steam pipe; some one will tinker with it and get burned"—that is sufficient. We think a jury might reasonably find that the intervening cause was foreseeable.

It is argued that placing uninsulated wires in a blacksmith shop 10 or 12 feet from the ground, where unskilled men are working with tools, some of them probably long, and leaving such wires unprotected for four months, is in itself negligence; that some injury should have been foreseen. We need not pass on that. The question of negligence and proximate cause should have been submitted to the jury.

■ There remains the question of contributory negligence. The plaintiff was a man of at least ordinary intelligence; he knew the function of the transformers; he knew the wires were of high voltage and dangerous; from the humming in the transformers, he knew the current was on. It is also true that he knew that the installation had been made by men skilled in the business; by men who knew that the blacksmith shop was in use by unskilled men. An ordinary man in a power house overcomes his timidity by the thought that skilled men have so constructed it that, if he does no unusual thing, he will not be hurt. A jury might find that the plaintiff was not negligent in failing to anticipate serious injury from the doing of such a natural thing as disconnecting the abandoned pipe.

■ Another ruling is complained of, that may or may not be now important. Although the record is not entirely clear, it is apparent that after the argument was fully concluded on the motion for a directed verdict, and after counsel were advised that the court intended to sustain it, plaintiff undertook to dismiss. The Iowa Code (Code 1927, § 11562) gives the plaintiff the right to dismiss "before the final submission * * * to the jury." What is a final submission is a question of state practice. Chicago, etc., R. Co. v. Metalstaff, 101 F. 769 (8 C. C. A.); Alsop v. McCombs (8 C. C. A.) 253 F. 949. The Iowa practice differs from many states, in that the Iowa Supreme Court has held that the cause is finally submitted when the court has announced his decision on a demurrer to plaintiff's evidence, and has made such entry in his docket; that the direction to the jury and the signing of the verdict is a formality. Marion v. Home, etc., Ass'n (Iowa) 217 N. W. 803. In the United States courts it is not mandatory that trial courts enter such orders on their dockets, or keep a docket at all. The lack of that formality, therefore, could not prevent a submission in the United States court in Iowa. The practice of first ascertaining the views of the court, after a fair trial, and then dismissing and suing again, if such views are adverse, should not be encouraged. Many years ago this court, through Mr. Justice Sanborn, quoted with approval the following:

"It is highly important that the court in the exercise of its discretion should not only

see that equal and exact justice is done between litigants, but it is equally important that needless litigation should be speedily determined, and in the trial of cases the court should consider the rights of the defendant as well as those of the plaintiff, and, where it appears that all the evidence which it is possible to obtain has been offered and the case has been submitted to the jury or to the court, it is the duty of the court, if in its opinion the evidence is not sufficient to justify a verdict in favor of the plaintiff, to direct the jury to return a verdict in favor of the defendant. The courts are not organized for the purpose of permitting the plaintiff in an action to experiment with a certain state of facts for the purpose of ascertaining the opinion of the court as to the law applicable to the same and then permit him to withdraw from the scene of conflict and state a new cause of action and mend his licks in another direction. Such policy, if adopted, would be productive of much mischief, and should not be tolerated." Francisco v. Chicago & A. R. Co., 149 F. 354, 9 Ann. Cas. 628.

The motion to dismiss was properly denied.

Objections were sustained to certain questions propounded by an expert witness. It is true, as appellee suggests, that it is not bound by the regulations prescribed by the National Electric Code. An expert may testify whether, in his opinion, a particular installation shown by the evidence is safe or proper; that opinion may be tested on cross-examination by reference to other authorities, and supported on redirect examination in the same way. The objections appear to have been sustained, because the court believed a proper foundation had not been laid when the questions were asked. That difficulty will probably not arise on another trial.

The judgment will be reversed for further proceedings in consonance with this opinion.