## EGAN CHEVROLET CO. v. BRUNER
(three cases).

### SAME v. GUNDERSON.
Nos. 11292–11295.

Circuit Court of Appeals, Eighth Circuit.
March 24, 1939.

Stan D. Donnelly, of St. Paul, Minn. (Wood R. Foster and Oppenheimer, Dickson, Hodgson, Brown & Donnelly, all of St. Paul, Minn., on the brief), for appellant.

C. A. Taney, Jr., of Minneapolis, Minn. (L. S. Doolittle, of River Falls, Wis., Fowler, Youngquist, Furber, Taney & Johnson, of Minneapolis, Minn., and Knowles & Doolittle, of River Falls, Wis., on the brief), for appellees.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

SANBORN, Circuit Judge.

These personal injury actions, which were tried together in the District Court and argued together in this Court, arose from a head-on collision between a Chevrolet automobile belonging to and being driven by Merle Bruner, a citizen of Wisconsin, and a Chevrolet truck owned by Hyman Rutman, a citizen of Minnesota, and being driven by one of his employees. The collision occurred upon United States Interstate Highway No. 12 at Baldwin, Wisconsin, on June 3, 1937, at 5:30 o'clock in the afternoon. The truck was at fault, having suddenly and without warning veered to the left and crashed into the

Bruner automobile. Mr. Bruner and those who were with him in his automobile were severely injured. The two employees of Hyman Rutman who were in the truck blamed the collision upon a breakdown of its steering mechanism. This mechanism was found to be disconnected after the collision. The day before the collision, Rutman had purchased this truck, a used 1934 Chevrolet, from the appellant, a Minnesota corporation and dealer in new and used motor vehicles at South St. Paul, Minnesota. It had taken the truck in trade, had inspected, repaired and reconditioned it, and had sold it to Rutman as a safe vehicle for use upon the public highways. In the belief that the appellant, at the time it sold the truck, knew or should have known that the steering mechanism was dangerously defective, and in the further belief that the negligence of the appellant in selling the truck in that condition was the proximate cause of the collision, the appellees brought these actions against it and Rutman. The appellant denied that it was negligent and denied that the collision was due to any defect in the steering mechanism of the truck. Rutman alleged that if the collision was caused by negligence, it was caused by the negligence of the appellant. The cases were tried to a jury, which returned verdicts against the appellant alone. From the judgments entered upon the verdicts, these appeals were taken.

The appellant contends: 1. That the court should have directed verdicts in its favor, because (a) it appeared conclusively from the evidence that the appellant had exercised the care imposed upon it by law with respect to the sale of this motor truck, and (b) the evidence tending to show that the cause of the collision was the defective steering mechanism of the truck was unsubstantial because speculative and opposed to physical facts. 2. That the court erroneously admitted in evidence testimony and exhibits regarding advertisements, warranties and representations of the appellant with respect to the truck sold to Rutman. 3. That the court erroneously refused to give a certain instruction requested by the appellant, and erred with respect to a portion of the instructions given.

Some of the questions argued may be disposed of briefly.

■ It is unimportant whether the controlling law is that of Wisconsin, where the accident happened, or that of Minnesota, where the truck was sold. There is no reason to believe that the common law of Wisconsin and the common law of Minnesota with respect to the liability of a used-automobile dealer, under the circumstances here presented, differs in the slightest particular. A comparison of the cases of Schubert v. J. R. Clark Co., 49 Minn. 331, 51 N.W. 1103, 15 L.R.A. 818, 32 Am.St.Rep. 559, Ellis v. Lindmark, 177 Minn. 390, 225 N.W. 395, and Ferraro v. Taylor, 197 Minn. 5, 265 N.W. 829, with the case of Flies v. Fox Bros. Buick Co., 196 Wis. 196, 218 N.W. 855, 60 A.L.R. 357, indicates that the applicable law of these states is the same and in accordance with the general law on this subject. MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440; Hudson v. Moonier, 8 Cir., 94 F.2d 132 (reversed because of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, on the ground that the case was decided without regard to what might be the common law of Missouri, where the accident occurred, 304 U.S. 397, 58 S.Ct. 954, 82 L.Ed. 1422), affirmed on reargument, 8 Cir., 102 F.2d 96, opinion filed March 6, 1939.

■ A retail dealer who takes a used truck in trade and undertakes to repair and recondition it for resale for use upon the public highways owes a duty to the public to use reasonable care in the making of tests for the purpose of detecting defects which would make the truck a menace to those who might use it or come in contact with it and in making the repairs necessary to render the truck reasonably safe for use upon the public highways, and is charged with knowledge of defects which are patent or discoverable in the exercise of ordinary care. This rule, we think, is readily deducible from Flies v. Fox Bros. Buick Co., supra; Hudson v. Moonier, supra, 94 F.2d 132; Ferraro v. Taylor, supra; MacPherson v. Buick Motor Co., supra; Sec. 404, p. 1092, Restatement of the Law of Torts. Compare Bergstresser v. Van Hoy, 142 Kan. 88, 45 P.2d 855, 99 A.L.R. 236. The rule does not mean—as the appellant seems to fear—that a dealer in used motor vehicles, who undertakes to recondition a truck for resale, becomes virtually an insurer of the safety of the truck he sells, nor does it mean that he is required to disassemble an entire

276

truck to examine each of its parts. It does mean that he must use reasonable care to ascertain whether the truck is equipped with the minimum essentials for safe operation, one of which unquestionably is a steering mechanism which will work and which will not shortly shake apart under normal use. One who permits a truck with a dangerously defective steering mechanism to be used upon the public highways, not only has reason to anticipate that it will cause an accident, but may be almost certain that it will do so. "In such circumstances, the presence of a known danger, attendant upon a known use, makes vigilance a duty." MacPherson v. Buick Motor Co., supra, page 1053 of 111 N.E., page 699 of L.R.A.1916 F.

■ The admission of evidence, over the appellant's objections, to show that at the time it sold this truck to Rutman it was holding itself out as a dealer in "O.K.'d used cars and trucks", that its used cars and trucks were in a lot at the entrance of which was a sign reading, "Egan's O.K.'d Used Cars, Truck Headquarters", and that the Rutman truck was in the lot and was an "O.K.'d" truck and had an "O.K.'d" tag on it, which meant that it was reconditioned and fit for use upon the public highways, was not, we think, reversible error. The appellees were endeavoring to establish responsibility for this allegedly dangerously defective truck being upon the public highway at the time of the collision. Up to the time of the introduction of this evidence, there had been no concession by the appellant that it had sold the truck to Rutman as a roadworthy truck. The evidence certainly had some bearing upon the nature of the appellant's undertaking with respect to the

truck and the duty which it owed to the public, and also some bearing upon the question of the duty of Rutman, whose defense was that he had purchased the truck from a reputable dealer who had represented that it was mechanically sound and fit for use, and that he (Rutman) therefore was excused from making an independent investigation to ascertain its condition. But even if the evidence had been inadmissible, we think its admission would not have been prejudicial. The appellant's real defense was that it had performed its duty with respect to the inspection and repair of this truck, that it had no knowledge, actual or constructive, of any defect at the time of sale, and that the accident was not due to any failure of diligence on its part. Its own evidence showed that it had sold this truck to Rutman as one which was safe and fit for use and that it in good faith believed it to be in that condition, and that it was still of the opinion, at the time of the trial, that the truck was not defective.

■ The District Court was meticulously careful in instructing the jury. The instructions we regard as entirely fair, accurate and complete. That being so, the court did not err in refusing to give the appellant's requested instruction,[1] the substance of which was sufficiently covered in the charge. Compare Hall v. Aetna Life Ins. Co., 8 Cir., 85 F.2d 447, 450. It is not conceivable to us that the jurors were misled as to the issues of fact, or that they supposed that the appellees' causes of action were based upon misrepresentation or breach of warranty in connection with the sale of the truck. The theory upon which the case was submitted is shown by the portions of the court's instructions quoted below.[2]

[1] "No verdicts in favor of plaintiffs and against defendant Egan Chevrolet, Incorporated, may be based upon any representations or warranties made or claimed to have been made with respect to the safety or fitness for use of the truck in the business of the defendant Rutman. The test of the liability of Egan Chevrolet, Incorporated, for the injuries to the plaintiffs is negligence. In other words, the question is was the defendant Egan Chevrolet, Incorporated, negligent in failing to exercise ordinary and reasonable care, as I have hereinbefore pointed out, to ascertain whether or not the truck was reasonably safe and fit to be used upon the streets and highways."

[2] "You are instructed that the defendant Egan Chevrolet Company was not an insurer of the condition of the truck in question, nor is it liable for unknown or hidden defects not discernible by using ordinary care. Second-hand trucks when properly repaired are not ordinarily regarded as inherently dangerous instrumentalities, and a truck does not become inherently dangerous because repairs made create a possibility of danger or injury. There must appear a probability of danger or injury. It must appear that as repaired the truck here involved could not be used in its then condition at the time of sale for the purpose for which it was intended to be used, without cre-

■ That brings us to the real question in these cases, which is whether there was any substantial evidence to sustain the verdicts. In considering that question, there are several matters to be kept in mind. *First.* All facts that the appellees' evidence reasonably tends to prove must be assumed to have been established, and all inferences fairly deducible from such facts must be drawn in their favor. Gunning v. Cooley, 281 U.S. 90, 94, '50 S.Ct. 231, 74 L.Ed. 720; Lumbra v. United States, 290 U.S. 551, 553, 54 S.Ct. 272, 78 L.Ed. 492; Illinois Power & Light Corporation v. Hurley, 8 Cir., 49 F.2d 681, 686; Columbian Nat. Life Ins. Co. v. Comfort, 8 Cir., 84 F.2d 291, 292; Svenson v. Mutual Life Ins. Co., 8 Cir., 87 F.2d 441, 442; Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 439. *Second.* Effect must be given to the rule that issues depending upon the credibility of witnesses and the weight of the evidence are to be decided by the jury. Gunning v. Cooley, supra, page 94, 50 S.Ct. page 233; Svenson v. Mutual Life Ins. Co., supra, 87 F.2d page 443; Elzig v. Gudwangen, supra, 91 F.2d page 439. *Third.* Oral evidence which is opposed to physical facts conclusively established is not substantial evidence. Elzig v. Gudwangen, supra, 91 F.2d page 440 and cases cited. *Fourth.* The weight of uncontradicted evidence and the credibility of the witnesses who gave it are usually for the jury to determine. Elzig v. Gudwangen, supra, 91 F.2d page 440. *Fifth.* It is only where the evidence upon any issue is all on one side or so overwhelmingly on one side as to leave no doubt what the fact is, that the court should direct a verdict. People's Savings Bank v. Bates, 120 U.S. 556, 562, 7 S.Ct. 679, 30 L.Ed. 754; Southern Pacific Co. v. Pool, 160 U.S. 438, 440, 16 S.Ct. 338, 40 L.Ed. 485; Gunning v. Cooley, supra, page 94, 50 S.Ct. 233; Svenson v. Mutual Life Ins. Co., supra, 87 F.2d page 443. *Sixth.* The question of negligence is usually one of fact for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence becomes one of law for the court. Sears, Roebuck & Co. v. Peterson, 8 Cir., 76 F.2d 243, 248, and cases cited; Young v. Baldwin, 8 Cir., 84 F.2d 841, 843.

■ The appellant contends that the testimony of the driver of the truck and of the man who sat beside him, that the collision was due to a sudden failure of the steering mechanism, was not substantial evidence. These men had a better opportunity than anyone to know exactly how and why this accident occurred. Their testimony is inconsistent with any theory other than that a sudden breakdown of the steering mechanism of the truck caused the collision. No physical fact which was conclusively proven demonstrates that their testimony was false. The steering mechanism was found to be disconnected after the crash. The appellant claimed that this disconnection was the result, and not the cause, of the collision. It introduced evidence tending to support that claim. It points to the bend in the steering connecting rod or drag link, the bend in the pitman arm and the sector shaft, the damage to the gears of the sector shaft and the worm gear on the steering post (indicating that the steering mechanism was intact at the time of the collision),

ating a certainty that its use would expose persons to the probability of injury.

"If there were defects in the repaired truck which were caused by the negligence of the defendant Egan Chevrolet, Incorporated, which defects were known to it, or by the exercise of reasonable care it could have been ascertained, then under such circumstances you would be justified in finding against said Egan Chevrolet, Incorporated, for injuries proximately resulting therefrom.

"If you believe, on the other hand, from all of the evidence, that the Egan Chevrolet Company in its work of repair on the truck in question exercised reasonable care and that the truck on the date of sale and delivery was in a reasonably safe condition and conformed to the representations made regarding it, as you may find the same to have been for the uses and purposes intended by the defendant Rutman and as understood by the Egan Chevrolet Company in the conduct of Rutman's fruit business on the public highways, and that the defendant Egan Chevrolet Company was not guilty of any negligence in the premises, then your verdict should be in behalf of the defendant Egan Chevrolet Company.

\* \* \* \* \* \*

"The defendant Egan Chevrolet, Incorporated, is liable in this case only if the collision and resulting injuries to the plaintiffs were the result of a defect in the steering apparatus of the truck which was known to the defendant at the time of the sale of the truck, or which by the exercise of ordinary care could then have been discovered."

the exaggerated account of the driver and his companion as to the number of times the steering wheel could be turned around after the alleged disconnection occurred, the failure of this experienced truck driver to apply the brakes immediately upon becoming aware that the truck could no longer be controlled by the steering wheel, and to the admitted fact that the truck operated perfectly up to the time of the collision in traveling nearly 200 miles during a period of 24 hours. Unquestionably, all of these things cast doubt upon the credibility of these men and the weight of their testimony. The jury could have rejected the testimony, but it was not compelled to do so. Under the rule of Elzig v. Gudwangen, supra, 91 F.2d 434, it was for the jury to say whether the collision was caused by a breakdown of the steering mechanism of the truck, as testified to by the men in the truck.

Having decided that the collision was due to a failure of the steering mechanism, the jury could find that it was defective at the time the truck left the hands of the appellant, since the evidence shows that the wear and tear to which it had been subjected since Rutman took possession was negligible and that, if sound, it would not have been shaken apart by ordinary operation upon a paved highway.

In considering the evidence relating to appellant's inspection of the steering mechanism of the truck, it is necessary to know, roughly, what that mechanism is and how its parts are connected. The steering wheel actuates the steering shaft or post, which, by means of a worm gear at the lower end connected with the gears of a sector shaft which extends horizontally through the left-hand side of the frame of the truck, turns the sector shaft. A pitman arm is fastened to and hung from the end of the sector shaft. This arm has a ball near the inside lower end, which is inserted and fastened into a socket in the rear end of the connecting rod or drag link, the front end of which rod or link is fastened to a similar ball on the steering third arm which is so connected with the front wheels of the truck as to turn them. When the steering wheel is turned, the pitman arm on the sector shaft is moved forward or backward, depending upon the direction in which the steering wheel is turned. As the pitman arm moves, either forth or back, it pulls or pushes the connecting rod attached to the steering

third arm, which then moves the front wheels left or right. After the collision, it was found that the rear end of the connecting rod was detached from the pitman arm. The manner in which the ball of the pitman arm is fastened into the connecting rod is this: there is a slot or elongated opening in the wall of the hollow rear end of the rod large enough at the back to permit the insertion of the ball, which is then moved forward until it comes into contact with a ball seat; another ball seat is inserted over the ball so that the two ball seats and the ball form a ball and socket joint; these parts are held in place by the cylindrical walls of the rear end of the rod and by a spring, a spacer and an adjusting plug which is screwed into the threaded end of the rod far enough to hold these parts in place and to prevent any possibility of the ball being pulled out or shaken out of the socket formed by the ball seats; the adjusting plug is kept from turning by a cotter pin which passes through the walls of the connecting rod and through a slot in the outer end surface of the plug. As an additional safety feature, the elongated opening or slot in the side wall of the rear end of the connecting rod through which the ball is inserted is not made large enough except at the rear to permit the ball to come out in case it should, in some way, be detached from the socket made by the ball seats. The method of attaching the front end of the connecting rod to the steering third arm is the same as the method of attaching the pitman arm to the rear end of the same rod.

After the collision, the only part remaining in the rear end of the connecting rod was the adjusting plug, which had been screwed down to a point which might be regarded as indicating either excessive wear in the ball and ball seats or the absence of some part. The edges and shoulders of the slot near the rear end of the connecting rod and the ball of the pitman arm were found to be so worn that the ball could be inserted in the slot at any point. The wear of the slot and the wear of the ball were excessive and obvious to the naked eye. The front end of the connecting rod was still fastened to the steering third arm after the collision, but, upon being disassembled, it was found to contain half a spring instead of a whole spring. It was conceded that this one-half spring would not produce spring tension. The use of springs to

produce spring tension in a connecting rod assembly is, no doubt, to lessen the effect of road shocks upon the steering mechanism, to prevent rattling of the parts, and to compensate for wear in the ball and ball seats.

The evidence shows that this truck had been taken by the appellant in trade in May, 1937; that the appellant's used-car foreman, on May 19, 1937, inspected the truck and noted repairs to be made, on a "Used Car Reconditioning" card. The notations on the card were: "Wash truck and motor; tune motor; check grease and oil; repair center bell housing (the housing behind the front universal joint); repair fenders and paint chassis; change battery; change tires around." The repair department made the indicated repairs, and a check mark was made after each item by the employee who did the work. By a further inspection, made by driving the truck for about six blocks, the used-car foreman discovered that the steering mechanism was loose and that other repairs were needed. The following notations were added to the shop card: "Repair speedometer; install L. door window; repair window runs; repair door straps; free up the right window; overhaul distributor; tune motor complete; tighten steering; 1½# of grease; repair grease leak; 4 lbs. grease." According to the appellant's evidence, the order to tighten steering "meant to check the steering gear, the drag link (connecting rod), the tie rod (the rod which holds the wheels in alignment), and if necessary the third arm and spindle, because there was looseness in the wheels."

The tightening of the steering mechanism was done by Lyle J. Kyle, a factory-trained master mechanic who had been engaged in repairing Chevrolet automobiles for twelve years. His usual work was on new and customers' cars. The used-car foreman asked him to check the steering gear of the truck sold to Rutman. Kyle took the play out of the steering mechanism without making any adjustments involving the connecting rod. He checked that rod for spring tension by taking it in his hand and twisting it back and forth. He did not remove the parts from either end of the rod, and did not get under the car to observe the condition of the slots through which the rod was connected to the pitman arm and the steering third arm. Kyle testified that if he had disassembled

the rear socket of the connecting rod, he would have seen the worn condition of the edges of the slot; that he could have seen its condition if he had made a close inspection, without disassembling it; that collisions frequently cause a separation of the connecting rod and pitman arm, but that he has seen pitman arms and connecting rods which have become separated without being in a collision; that it would have taken him about five minutes to disassemble the connection between the arm and the connecting rod, and perhaps fifteen minutes to reassemble it. He further testified that the manner in which he examined the connecting rod was the approved method of making the examination of that part of the steering mechanism to determine its fitness for use on the road; that in his opinion the truck sold to Rutman had a steering mechanism which was reasonably safe for use on the highway; that, aside from the adjustments which he made, he discovered nothing that should have been done.

William Westerdahl, a mechanic of fifteen years' experience, testified for the appellees, "that in order to really find out as to the conditions existing in the drag link (connecting rod), it would have to be taken apart; that if he had been testing the drag link, one of the things he would have done would have been to take hold of it and shake it; that you would detect any excessive looseness or wear by that method; that if excessive looseness showed up that would indicate parts were in need of adjustment or replacement; that absence of spring tension could not necessarily be determined by that test."

Kyle's testimony that his twisting test of the connecting rod was sufficient was somewhat discredited by the fact that the disassembling of the front end connection of that rod, after the collision, disclosed only half a spring and a washer which was no part of the standard equipment. He conceded upon the trial that there would have been no spring tension at that end. Therefore it might be believed that his test did not inform him accurately of conditions.

We think that from the evidence adduced upon the trial the jury could have found that the defect in the steering mechanism of the Rutman truck which caused this collision would have been discovered had the appellant used reasonable care in examining and testing that mecha-

nism. It is true that the discovery of the worn condition of the edges and shoulders of the slot near the rear end of the connecting rod, a patent defect, might not have informed the appellant that the connection between the rod and the pitman arm was dangerously defective. It would, however, have indicated excessive wear at one point in the connection and might reasonably be regarded as a danger signal calling for further inquiry and investigation, involving the dissassembling of the entire connection with the pitman arm. Having been placed upon inquiry, the appellant could, properly we think, be charged with knowledge of the facts which the indicated inquiry, if pursued, would have disclosed.[3]

In our opinion, the evidence does not conclusively show that the appellant used reasonable care in examining the truck for defects in its steering mechanism, in reconditioning that part of the truck, and in selling the truck for use upon the public highways. The question of negligence was, therefore, a question of fact for the jury and not a question of law for the court. The court did not err in denying the appellant's motions for directed verdicts.

The judgments are affirmed.

---

[3] See and compare, Coder v. McPherson, 8 Cir., 152 F. 951, 953; Mathis v. Hemingway, 8 Cir., 24 F.2d 951, 956; King Cattle Co. v. Joseph, 158 Minn. 481, 198 N.W. 798, 199 N.W. 437; State v. Ryder, 126 Minn. 95, 107, 147 N.W. 953; 46 Corpus Juris 543. See, also, Boatman v. Miles, 27 Wyo. 481, 199 P. 933, 26 A.L. R. 864 and annotation on page 871.