CLINTON FOODS, INC., a corporation, Appellant,

v.

Marvin YOUNGS, Appellee.

No. 15887.

United States Court of Appeals Eighth Circuit.

April 17, 1959.

Rehearing Denied May 11, 1959.

Craig Cook and Wayne G. Cook, Davenport, Iowa (Cook, Blair, Balluff, Wedean & Nagle, Davenport, Iowa, on the brief), for appellant.

Carl H. Lambach, Davenport, Iowa (Margaret Stevenson, Davenport, Iowa, Isador Katz, Rock Island, Ill., Lambach, Stevenson & Dircks, Davenport, Iowa, and Reidy, Katz, McAndrews, Durkee & Telleen, Rock Island, Ill., on the brief), for appellee.

Before GARDNER, Chief Judge, and SANBORN, WOODROUGH, JOHNSEN, VOGEL, VAN OOSTERHOUT, and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

In this diversity case, Marvin Youngs, plaintiff below, employee of contractor engaged in work on defendant's premises, obtained a jury verdict and judgment for $80,000, as damages for personal injuries received from electrical shock. Clinton Foods, Inc., defendant below, filed timely motions for directed verdict and for judgment notwithstanding the verdict, which were denied, and this appeal followed. We shall refer to the parties as designated in the trial court.

We have for determination the sole question of whether, under the evidence, the jury could properly find that the defendant negligently failed to give adequate and sufficient warning in view of the circumstances existing when plaintiff was injured. Since the primary question is focused upon the sufficiency of the evidence, defendant cannot prevail unless it is determined that there

was no reasonable basis upon which findings of negligence and defendant's ultimate liability for plaintiff's injuries could be based. See Gowing v. Henry Field Co., 225 Iowa 729, 281 N.W. 281, 283, where the court stated:

"In passing on defendant's motion to direct a verdict, the plaintiff is entitled to have the evidence considered in the light most favorable to him. * * * 'Every inference reasonably permissible in support of the issue should be carried to the aid of the evidence.' McWilliams v. Beck, 220 Iowa 906, at page 909, 262 N.W. 781, at page 782."

See, also, Egan Chevrolet Co. v. Bruner, 8 Cir., 102 F.2d 373, 377, 122 A.L.R. 987. The case rests upon this factual foundation:

Defendant, as the owner of a food processing plant at Clinton, Iowa, entered into a contract in 1953 with Pittsburgh Piping and Equipment Company, plaintiff's employer, for the installation of a new turbine on defendant's property. In order to effectuate the installation, Pittsburgh was required to lay a 20-inch pipe line on the premises of defendant. The controlling plans and specifications, as prepared by defendant, required that the pipe line be laid on and along a portion of defendant's property which was enclosed. In the enclosed area were two banks of electrical transformers. A photograph and other evidence reveal that one set of transformers, referred to as "emergency transformers," has the appearance of three cylindrical objects of metal, approximately 4 feet in height, with insulated electric wires leading into and out of the top of each cylinder. These "emergency transformers" were resting upon a concrete foundation, the top of which was approximately two feet above the surface of the adjacent ground. It also appears that defendant had its own power plant and generated its own electrical energy, but to ward against a possible power failure in its own plant, electric energy was obtained from the Interstate Power Company, and such energy was transmitted through the emergency transformers. Although they did not feed current into defendant's plant, except on the rare occasions when defendant's own power plant failed, the emergency transformers were, in the words of its mechanical engineer, "kept live all the time because they would all cut in. They were not serving any purpose other than in those rare times." However, the same witness testified that the cylindrical case around each transformer was not "live." "They are grounded out so there is no danger in touching them." Electric current was brought into the emergency transformers by a "feedwire." This is the wire which plaintiff came into contact with and which caused his injuries. It carried from 6,900 to 13,200 volts, and was mounted vertically along the frame supporting the transformers. This wire was covered with insulation. With reference thereto, we have this information from a Mr. Shannon, defendant's mechanical engineer:

"The wire coming down to the rear on Plaintiff's Exhibit 5, is the one—the high tension line. It is also shown on Exhibit 3. It comes down and is fastened to an insulator. Loops out here and then goes up into the transformer. Here is disconnecting switches there. * * * The wire that comes down out of this insulator was covered with an insulating substance, but it wasn't insulated for that purpose. It happened that it was the right sized wire and they used it. It isn't customary to insulate that tension of wire and wasn't put there for insulation purpose. Normally that wire would be bare because for purposes of insulation, that insulation was absolutely worthless—might just as well not be there."

By the same witness, it was further developed that there was a switch whereby the current could have been cut off from the emergency transformers, but it was not the practice of defendant to open the circuit switches and cut off the current. The defendant's Superintendent

of Power in his testimony explained the reason why the defendant considered it necessary to keep these transformers constantly energized, and, among other things, said: "A very temporary shutdown of the emergency transformer, such as 5 minutes, could have endangered our plant."

The current generated by defendant's plant was fed through the other set of transformers mentioned, which were located about twelve feet from the emergency transformers. These transformers, known as "step-down" transformers, carrying 440 V. were not encased, and were described as "corrugated, cylindrical objects," with an exposed bus bar to the rear of them.

In installing or laying of the water main, it was necessary to first dig a ditch near both sets of transformers, described above and it was while the crew of Pittsburgh's men were engaged in laying a section of the water main in the ditch near the emergency transformers, that plaintiff came in contact with the lead-in insulated wire before described. At that time, plaintiff was required to work on an artificially raised ground level, in closer than usual proximity to the emergency transformers and lead-in wire. The events surrounding and immediately preceding the occurrence were described by Pittsburgh's foreman, Edward Morgan, in this manner:

"I saw Mr. Youngs immediately before he got hurt. I was standing on one of the dirt piles north of that emergency transformer bank, facing towards the slough.

"We were putting this piece of pipe in the ditch, and we had a chain fall on this timber over the center of the ditch. We had a rope snubbed on each end of the pipe and Sullivan and I was on the one end and we had it snubbed around a telephone pole, and the other boys, two of them were on the other one or one of them was, or one on the chain fall, I don't remember. I know I was on the one line that was around the tele-

phone pole, and we was holding the pipe back snubbing it while it was being dragged in the ditch by the chain fall and as the pipe swung in chaing fall and as the pie swung in the ditch and settled down I looked up, turned to the pump house and looked up and Bud (Youngs) was taking a step or was going off that plank, as I see it, off the plank towards the pump house, and the only thing I think he was going, he was going over to the ladder next to the pump house to go down the ladder to help land the pipe in the ditch. As he stepped in that direction I saw a big flash and a drop of—like a drop in power or short, and that was it * * * Bud fell back I would say north away from the pump house, and he fell and his shoulders hit across the timber we had across the ditch and his arm fell over the top of the timber and his head, or whichever you want to call it, head or neck, maybe a difference of opinion there, rested up against the angle iron on the corner of that transformer bank. The dark end spot on the angle iron, as it appears on Plaintiff's Exhibit 3, is where his head or neck was resting—that burned spot."

The record also establishes that the defendant actively supervised the installation of the project and particularly the laying of the water main. Mr. Shannon, defendant's engineer, testified: "[t]he laying of the water main along the bank on the property was directly under my charge," and "[i]t was my particular job to see that that pipeline was in accordance with specifications * * *."

*On the warning issue.* There were several signs in and on the enclosure displaying the words "Danger 13,200 Volts." One of these signs was on a pole approximately six feet from the place where plaintiff came in contact with the wire, and the other signs were on the fence enclosing the area. As to oral warnings, there is decided conflict and dispute. However, there was unequivo-

cal testimony from which a jury could find that all oral warnings given by defendant were directed to the open, corrugated transformers and the 440 Volt bus bar, and that there was a total failure to warn of the danger lurking in the lead-in wire to the emergency transformers. On this issue, plaintiff testified:

"We had worked intermittently about 5 days in the area. At the time that they first discussed going through that enclosed area with a pipe line, several of the boys and myself discussed whether or not that was a wise idea. Of course we don't design the jobs nor is it our place to say where it goes. Our job is to do it. We discussed that, and the only information or warning that I ever got was the fact of an exposed bus bar at the far end. That came up at the time when Mr. Owen and Mr. Johnson were laying out elevation lines in the ditch itself, for the excavation of the ditch. That was the incident to which Mr. Morgan testified yesterday. I had never received any warning of any kind to indicate that the wire you are pointing out which runs down a steel flange to what appears to be the rear of transformers that have been identified as emergency transformers, present any unusual hazard. We had not been warned that the wire was the equivalent of a bare wire carrying 13,000 volts. Had it been bare, we wouldn't have gotten within 3 foot of it.

"At no time, prior to October 9, when I was injured as others have described, did I ever hear any discussion from anybody, either my employer or Clinton, of an offer of rubber mattresses or any other safety devices to shield us against any dangers. I can best answer your question as to whether I was aware of any dangers other than the bus bar that might have required such protection, by saying that transformers ordinarily are dangerous, but it is primarily the wiring above the transformer—high up out of reach—and, as a matter of fact, all of the high voltage wires I have ever seen have been bare wires when they come in a transformer area. From the picture, that wire was covered."

The testimony of Mr. Shannon, defendant's mechanical engineer, as to the warning imparted by him, reduced to narrative form, is:

"As nearly as I remember, I said, loud enough so that any of the workmen could hear, and purposely so, 'Watch out for those transformers. They are hot and they will bite.' That was the nature, character and phraseology, in substance, as near as I can remember. I went into detail about it once over by the pumphouse where it was 440 volts [the open corrugated transformers], and where they were throwing dirt up there. I said, 'Now, you are getting where that is dangerous. You can walk right into that and if you do it will bite.' In that situation I specifically pointed out the bus bar because they had piled the dirt so high you could walk right into it. I don't know who was present when I said that. I didn't pay any attention to the particular men."

Another witness, a former employee of Pittsburgh, stated: "We had been told that the only thing we had to worry about was the bus bar. It was Eddy (Mr. Morgan) told us. I don't know who told him. Nothing specific otherwise was called to my attention." And finally, Mr. Hartmann, electrical engineer for defendant, gave this version:

"In my dealing with Mr. Muter I knew that he was going to be working in this danger area, and I therefore told him on several occasions that he should be careful as the conditions in there would warrant and, at the time he first started digging in there I warned him that there was a possibility of someone getting in contact with the open bus.

on the 440-volt transformer and the answer I received was, 'Well, no one has up to this time.' "

██ It stands conceded that plaintiff as an employee of an independent contractor, was a business invitee. The Iowa law, which controls here, in respect to the duty owed by the owner of premises to an independent contractor or an employee of such contractor, is clearly stated in Gowing v. Henry Field Co., 225 Iowa 729, 281 N.W. 281, at page 284, in this language:

"The only duty owing by the defendant to the plaintiff as an independent contractor was that of exercising reasonable care to promote his safety. Plaintiff was an invitee *and it was defendant's duty to warn him of any danger in and about the premises which he knew of or in the exercise of ordinary care ought to have known of and of which plaintiff was not aware or which in the exercise of ordinary care on his part would not have been discovered.* Steele v. Grahl-Peterson Co., 135 Iowa 418, 109 N.W. 882.

"Defendant was not responsible to plaintiff as an independent contractor for injuries from defects or dangers which the contractor knew of or ought to have known of, *'but if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this, he is liable for resultant injury.'* Douglass v. Peck & Lines Co., 89 Conn. 622, 95 A. 22, 25; 44 A.L.R. 894, note; Arizona Binghampton Copper Co. v. Dickson, 22 Ariz. 163, 195 P. 538, 44 A.L.R. 881." (Emphasis supplied.)

More recently, in Atherton v. Hoenig's Grocery, 86 N.W.2d 252, 255, the Supreme Court of Iowa re-announced the principle that an owner of premises is under a duty to warn an invitee of any danger of which the owner was aware and of which the invitee was unaware.

With the law in this posture, the crucial question is—Do the facts establish, as a matter of law, that plaintiff was adequately warned or was aware of the dangerous instrumentality which caused his injury, or in the exercise of ordinary care on his part, could he have discovered such danger? Viewed in light of all of the circumstances, if the factual situation is such that reasonable minds could differ as to whether the warning given was adequate and sufficient, then we must resolve the issue in favor of plaintiff.

One important circumstance to consider is that here, unlike the situations in Gowing and Atherton, we are concerned with the dangerous agency of electricity. This circumstance does not necessarily change the legal duty imposed upon one in charge of the dangerous element, but it is abundantly clear from the expression of the courts dealing with Iowa law on the subject, that the character of the instrumentality must be taken into consideration in determining whether those in charge thereof have in fact exercised reasonable or ordinary care. Thus, this court stated in Yarn v. Fort Dodge, D. M. & S. R. Co., 8 Cir., Iowa, 1929, 31 F.2d 717, 718, certiorari denied 280 U.S. 568, 50 S.Ct. 27, 74 L. Ed. 621, where the employee of a mining company, which was furnished electricity by defendant, was injured while removing a steam pipe in close proximity to bare high tension wires:

"The defendant is not an insurer; like all others, it is liable for failure to exercise reasonable care *under the circumstances.* But the care required of one installing 22,000 volt wires is different from that required of one installing steam pipes, just as the mythical 'reasonable man' must drive a car loaded with cans of nitroglycerine more carefully then he need drive the same car loaded with cans of milk." (Emphasis supplied.)

In Iowa-Illinois Gas & Electric Co. v. Young, 8 Cir., Iowa 1950, 179 F.2d 485, 489, this Court was required to pass up-

on the propriety of the trial court's instruction in which the jury was told that in determining the question of whether defendant was negligent—

"'* * * it is proper for you to consider, together with all the other facts and circumstances, that the handling of electricity is a matter that requires skill and understanding of the dangers thereto; that a current of electricity of high voltage is a dangerous and deadly element traveling through and along wires and other conductors without being visible or easily detected; *and a person who deals in it and handles such an element is bound to use a degree of care commensurate to the dangers involved to protect others from harm.'*" (Emphasis supplied.)

In approving this instruction, this Court, speaking through Judge Woodrough, stated at page 489:

"We think the submission of the issue of defendant's negligence on the instructions given is supported by the decisions of the Supreme Court of Iowa and the law of Iowa as declared by this Court. Reynolds v. Iowa Southern Utilities Co., supra [8 Cir., 21 F.2d 958]; Yarn v. Fort Dodge, Des Moines & Southern Ry. Co., 8 Cir., 31 F.2d 717; McKiddy v. Des Moines Electric Co., 202 Iowa 225, 206 N.W. 815." [1]

Defendant's position is two-fold. First, it is urged that because plaintiff was aware that the enclosure in which he and others were working contained 13,200 volt equipment, coupled with his general knowledge that transformers are used to conduct electricity, completely relieved defendant of the duty to give any warning of the danger in and about the emergency transformers. Second, it is said that the warnings imparted by the signs bearing the legend "Danger 13,200 volts," coupled with the verbal statements made from time to time that the area was "hot," completely satisfied any legal obligation with respect to warning so as to remove that issue, as a matter of law, from the case. We are not persuaded to accept either contention.

Reviewing the case in the most favorable light, we find that while there was evidence that knowledge had been imparted to employees of Pittsburgh that the enclosed area was "hot," logically, it can hardly be urged that the entire area was literally charged with electricity, or that Pittsburgh's employees should believe it to be so. Indeed, defendant itself recognized that such was not the situation, for it prepared the plans whereby it became necessary to lay the water main through the area. By so doing, and by directing a specific warning only to the open, uncased, corrugated transformers and the 440-volt bus bar adjacent thereto, the jury could properly find that, implicit in defendant's "invitation" to work within the area was the representation that the area was relatively safe, except around the dangerous instrumentality, i. e., the uncased transformers and bus bar. That the entire area was not virtually a "chamber of horrors" is borne out by defendant's conduct during the course of the pipe installation. Although defendant must be charged with knowledge of the dangerous character of the lead-in wire which injured plaintiff, all specific warnings were directed solely to the uncased transformers. Through its representative who was supervising the installation, the defendant repeatedly warned Pittsburgh employees of the danger that lurked in and about the bus bar and corrugated transformers. They were told "[n]ow, you are getting where that is dangerous. You can walk into that and if you do it will bite. In that situation I specifically pointed out the bus bar because they had piled the dirt

[1]. See also Beman v. Iowa Elec. Co., 205 Iowa 730, 218 N.W. 343, 345; Knowlton v. Des Moines Edison Light Co., 117 Iowa 451, 90 N.W. 818; Reynolds v. Iowa Southern Utilities Co., 8 Cir., Iowa, 21 F.2d 958; Loveless v. Town of Wilton, 193 Iowa 1323, 188 N.W. 874, 877; Toney v. Interstate Power Co., 180 Iowa 1362, 163 N.W. 394, 397.

so high you could walk right into it." But there the verbal warning stopped. There is credible evidence from which a jury could properly find that at no time was there any warning given that inasmuch as the lead-in wire carried as much as 13,000 volts, it was even more dangerous to work in close proximity to this wire. Surely defendant was fully aware that work was progressing in the immediate vicinity of the emergency transformers. Defendant's supervisor, Mr. Shannon, testified, "I had been there within a few minutes before the accident. I had just left when the accident happened." But he gave no warning of the impending danger, at least there is evidence that he did not. Nor are we justified in holding that, apart from any oral warnings, plaintiff's knowledge, as a reasonable man, concerning the dangerous character of electrical equipment generally, would bar him from recovery as a matter of law. That the dangerous object which caused the havoc to plaintiff was neither open nor obvious is scarcely debatable for as we have seen, the offending device (the lead-in wire), was covered with insulation, and this, together with the fact that all specific warnings were directed to the 440 volt bus bar, could have the conceivable effect of lulling a reasonably prudent person into a sense of safety. But the insulation was not intended nor designed to render the wire harmless if contact therewith was made. In the words of defendant's Mr. Shannon: "It isn't customary to insulate that tension of wire and wasn't put there for insulation purpose. Normally that wire would be bare because for purposes of insulation, *that insulation was absolutely worthless*— might just as well not be there."

We have indulged in an exhaustive review of the facts, and have carefully studied decisions of the Iowa courts bearing upon our factual situation. As previously discussed, the particularly dangerous element of electricity here involved is a circumstance properly to be considered by a jury in determining whether defendant has exercised ordinary care. Here, there was evidence from which a jury could justifiably find that the wire which injured plaintiff constituted a latent danger; that this danger was known to defendant; that plaintiff did not have actual knowledge thereof and in the exercise of ordinary care on his part would not have discovered the same; and that, under the circumstances, the warning given by defendant was inadequate.

Affirmed.

VAN OOSTERHOUT, Circuit Judge (dissenting).

I agree with the majority's conclusion that plaintiff was an invitee of the defendant. Plaintiff was an employee of Pittsburgh, an independent contractor, engaged to do the construction work here involved. It is stipulated that Pittsburgh's status was that of an independent contractor, and that Pittsburgh under its contract "shall furnish all labor and materials, tools, supervision and methods as outlined in the specifications." Defendant had no supervisory power over the plaintiff, but had only the right to see that the end product of Pittsburgh's work conformed to the specifications. It is apparent that plaintiff was not an employee of defendant. Thus, defendant was under no legal obligation to furnish the plaintiff with a safe place to work. No claim is made that the defendant did anything to create an unsafe condition upon its premises during the period the work project was being carried out. The electrical equipment in the enclosed area, with respect to being energized and in all other respects, was the same at the time of the accident as it was when the project was commenced. Under such circumstances, as the majority properly states, defendant's legal obligation towards Pittsburgh and plaintiff, as Pittsburgh's employee, is that announced in the Gowing and Atherton cases, cited and quoted by the majority. Defendant's duty to plaintiff as an invitee was to warn the plaintiff or his employer of any hidden danger of which the defendant knew or in the exercise

of ordinary care should have known, and which was not known, or in the exercise of ordinary care could not have been known, to the contractor or the injured employee.

The plaintiff was injured by a wire leading into a transformer. There is serious doubt whether any hidden danger situation is presented. Plaintiff concedes that the employees at the time the project was commenced discussed among themselves the wisdom of working in the enclosed electrical area. Plaintiff testified that he was "familiar with transformers, generators and electrical equipment to the extent that anyone who comes anywheres near them would be familiar with them," and that "it would be a safe assumption on the part of anyone entering an enclosed area of this nature, that some of the transformers might be energized." He also admitted that transformers are dangerous, primarily the wiring above the transformer.

The injury-inflicting wire led into what are described in the majority opinion as "emergency transformers." At the time of the accident neither the plaintiff nor his employer knew that the transformers were emergency transformers. Plaintiff so testified. So did Pittsburgh's foreman.

If any hidden danger existed as to which defendant was required to give warning, the defendant fully complied with such duty. The electrical area, in which the transformers were located, was enclosed by a fence upon which signs were erected, reading "Danger 13,200 Volts." Similar signs were posted within the enclosed area, one within a few feet of the immediate scene of the accident. Plaintiff admitted seeing such signs. It is likewise established beyond dispute that defendant's foreman orally advised Pittsburgh's foreman that the electrical equipment in the fenced area was "hot," and that defendant's powerhouse engineer gave a similar warning. Such warning was broad and by its terms applied to all of the electrical equipment in the enclosure, of which the

transformer and the lead-in wire were a part.

There is substantial evidence by Pittsburgh's foreman that he conveyed the warning information to its employees. Plaintiff testified in substance that he believed his foreman's statement that he gave such warning, but plaintiff states that he did not hear it given. To the extent that any oral warning was required, defendant met its obligation by warning Pittsburgh's foreman. It was Pittsburgh's duty to protect its workmen.

The majority attaches considerable significance to bus bar warnings. The bus bars were on other transformers located at some distance from the scene of the accident. It is true that the defendant's employees did in a few instances give specific warning as to the bus bars at a time when Pittsburgh's employees were working in the immediate vicinity of the bus bars. Plaintiff admits hearing the bus bar warning, but states: "The exact location of that bus bar I don't know. If I saw a bus bar I would recognize it immediately and I would know then where it was, but I never actually saw the bus bar." It is difficult to see how plaintiff could have been misled by the bus bar warnings. The bus bar warnings were not inconsistent with and did not detract from the broad overall warning conveyed by the enclosing fence, the signs, and the oral warnings.

Plaintiff also urges that he was misled by the circumstance that the lead-in wire causing the accident was insulated. The testimony is that the insulation afforded no protection on a wire of this voltage, and there is also testimony that lead-in wires of this type are usually bare. Defendant's warnings were not limited to bare wire, but covered the hazards of all electrical equipment in the fenced area. Plaintiff's own testimony shows that he knows that wires above transformers are particularly dangerous. The record does not fairly warrant any inference that the plaintiff relied in any way upon the fact that the lead-in wire

was insulated. It is apparent that plaintiff did not learn until after the accident that the lead-in wire which caused his injury was insulated. One of plaintiff's specifications of negligence is, "In failing to cause the wires to which plaintiff was exposed, if live, to be properly and adequately insulated."

The plaintiff has suffered serious injuries in an unfortunate accident. In my opinion he has wholly failed to establish actionable negligence on the part of the defendant. Under the circumstances of this case, the defendant can not be charged with any negligence that might have existed on the part of plaintiff's employer. The motion for a directed verdict should have been sustained. I would reverse.