George **MANAIA** et al., Plaintiffs,

v.

**POTOMAC ELECTRIC POWER COMPANY**, Defendant.

Civ. A. No. 9057.

United States District Court
D. Maryland.

July 18, 1958.

Herbert M. Brune, Baltimore, Md., Sheldon E. Bernstein, Wilmer S. Schantz, Jr., Newmyer & Bress, Washington, D. C., R. Edwin Brown, Harper M. Smith, Rockville, Md., for plaintiffs.

Richard W. Emory, Robert R. Bair, Joseph France, Venable, Baetjer & Howard, Baltimore, Md., William B. Jones, Hamilton & Hamilton, Washington, D. C., Cornelius Means, Washington, D. C., of counsel, for defendant and third party plaintiff

R. DORSEY WATKINS, District Judge.

From adverse judgments on jury verdicts for personal injuries to five of the plaintiffs and for the deaths of two other persons,[1] from current transmitted through the boom of a crane which came into close proximity with a power line of the defendant, Potomac Electric Power Company (Pepco), that company in due time moved for judgment n. o. v. or in the alternative for a new trial. It will therefore be necessary to review the facts in the aspects most favorable to plaintiffs, and determine whether they afford a reasonable basis for the verdicts, in light of the admonition of the Court of Appeals of this Circuit as to the limited authority of trial judges to disturb jury verdicts. Burcham v. J. P. Stevens & Co., 4 Cir., 1954, 209 F.2d 35, 38.

[1.] Eight claims were made in the complaint, five for personal injuries, expenses, loss of earnings, etc., on behalf of the individual plaintiffs; one by the administratrix of a decedent for conscious pain and suffering, and funeral expenses, and a death suit on behalf of the widow and minor child of the same decedent; and the last, a death suit on behalf of the dependent father of a decedent. The claims were tried together, separate verdicts and judgments being rendered and entered. Except where distinction is necessary, reference for convenience will simply be made to the "plaintiffs."

## Facts

Pepco is a public utility company, engaged in the generation and distribution of electric energy. Among its facilities are a sub-station in Wheaton, Maryland, on the Old Bladensburg Road, near its intersection with Fern Street. A 33,000 volt, three-wire electric line, supported by cross-arms on poles, crosses Fern Street at approximately 30 feet south of Old Bladensburg Road, and enters the sub-station. The lowest wire at its critical point is 31 to 31½ feet above the surface of Fern Street.

In the first part of 1955 Fern Street was an unpaved dirt road, extending for approximately one and one-half blocks south of Old Bladensburg Road. Montgomery County decided to have Fern Street paved, and on February 15, 1955, sent notice to abutting property owners, including Pepco, of a paving assessment. On June 8, 1955, a general plan of the proposed paving of Fern Street, and the adjacent territory, was sent to utility companies, including Pepco, having facilities in the vicinity. This called for the paving of Fern Street from Old Bladensburg Road south. While most of the paving was to be of concrete, consisting of four ten-feet wide strips, the northern portion, including the part directly [2] under Pepco's 33,000 volt line, was to be paved with macadam. It required that "arrangements be made for prompt relocation of such utilities as may be fouled by proposed street improvements," and stated that it was hoped work on the street would be started not later than June 20, 1955.

About the middle of July, 1955, the contract for the paving of Fern Street was closed with Sligo Engineering Company (Sligo), employer of the plaintiffs, and notice to proceed was given it.

On July 20, 1955, a revised plan of Fern Street was sent Pepco. This was identical, as far as measurements were concerned, with the print in the letter of June 8, 1955, but contained the legend "use conc.[3] finishing machine on slabs."

Fern Street was graded by Sligo during the period August 1–4, 1955, and some of Pepco's poles were moved by Pepco during this period. Among these was the pole on the west side of Fern Street carrying the 33,000 volt wires. This was moved six-tenths of a foot west, so as to place it a distance of two and one-tenth feet from the curb, because of proximity to the paving operation. The moving of the pole was not related to any relocation of the overhead wires, and at no time prior to the casualties was Pepco ever asked or directed by anyone to change the location of its overhead Fern Street wires, or to reduce or cut off the voltage running through them.

Shortly before the first of September 1955 a representative of Pepco was present on the then graded but unpaved Fern Street. He was met by a Montgomery County inspector, who questioned him about the underground facilities of Pepco in the street. Specifically he was asked about the voltage of the wires in the underground conduits (which are 13,200-volt insulated lines). Nothing was asked or said about the voltage in the overhead uninsulated lines. At that time no crane was present on the job, nor is there any evidence that a crane had been on Fern Street at any previous time.

At a time fixed only as one week or one day before September 2, 1955, Louis

---

**2.** According to Pepco's Vice-President and General Manager, the blue print showed the concrete paving as ending 58.14 feet south of Old Bladensburg Road on the west side of Fern Street, and 72.68 feet south, on the east side of Fern Street. Plaintiffs contend that these readings should be 47 and 53 feet respectively, or 51 and 56 feet respectively, depending upon the diagram used. There is no question but that on any theory of the evidence, the wire involved was located north of the south end of, and therefore within the area to be covered by, the macadam paving. A conservative estimate would put the critical point 20 feet north of the north end of the concrete.

**3.** It is not contested that "conc." is an abbreviation of "concrete."

Manaia[4] brought in a crane, took a concrete finishing machine off a trailer, and put it on the east shoulder of Fern Street, south of the 33,000 volt lines.

In a paving project of this kind, after grading, rails or forms are laid. These serve the dual purpose of fixing the width and approximate depth of the lane or slab of concrete poured, and of supporting a concrete finishing machine. Such machines, specified for use in this paving, are often used in concrete paving. These are four-wheeled machines, weighing a ton or more. They are approximately 12 feet long, adjustable in width to that of the lane or strip of concrete being laid and to be finished, are equipped with a chain driven blade, and are self-propelled. Their wheels run on the rails or sides of the lanes. The blade smooths, or "finishes", the surface of the poured concrete. When one slab is finished, they can be driven off under their own power. Normally, one lane is then skipped, and work continued from either end of the next lane.

While on September 2, 1955, a few finishing machines were equipped with hydraulic lifts so that no extra equipment was needed to place them on the rails, it was customary to position them by use of either a front-end loader; an excavating shovel; the boom of a shovel; or a crane, the latter being most frequently used. In such cases the finisher would ordinarily be lifted by a metal cable attached to the end of the cable boom.

Sligo's crane, used to place the finisher, prior to September 2, 1955, on the east side of Fern Street south of the 33,000 volt wires was a new one, purchased in July 1955, and had a 40-foot boom. It was not equipped with an electric signaling device which would give warning of the approach of the boom to electrically charged wires.

Sligo had other paving work in the general vicinity of Fern Street, which it intended to finish before starting the concreting of Fern Street. No actual notice was given Pepco by anyone as to when the concrete work would begin on Fern Street, or that a crane would be used.[5]

On September 2, 1955, at about 10:30 a. m., Sligo's crane was driven to Fern Street by George Manaia, one of the plaintiffs. It was backed in, stopping with the front, or truck, almost at Bladensburg Road. The crane itself was under the control of Louis Manaia, George's father, and a defendant. He had been instructed by Manuel Leal, superintendent of Sligo, to put the concrete finishing machine, brought in the day or week before, on the forms. The spot where the finishing machine was to be placed, and the location of the crane, were determined by Leal.

The Montgomery County inspector, who first learned "positively" that a crane would be used when it came onto Fern Street that morning, called to Leal's attention that the crane would be working under wires. Although the inspector did not know the voltage of the wires, he cautioned Leal, but would have permitted Leal to proceed, even if the inspector had known the wires carried high voltage.

The point selected by Leal for the placing of the finishing machine on the form was north of where the concrete would begin. As a consequence, when the crane was positioned, the wires were five to ten feet to the south, or in front, of Louis Manaia, who could see them

4. A non-resident third-party defendant, who was not served and did not enter an appearance. Statements made during the course of the trial indicated that he was then hospitalized. His testimony was therefore offered through deposition previously taken by Pepco.

5. The contract with Montgomery County required the contractor (Sligo) to take suitable precautions to prevent damage to underground or overhead public utility structures, and to notify public utility companies to make all necessary adjustments in their equipment. On other projects, Sligo had notified Pepco to move its "poles, wires, et cetera in the way of construction."

clearly from the open cab of the crane. The boom was swung to the left, and the finishing machine picked up. To swing it around and place it, the boom had to be raised over 30 feet. Louis Manaia lifted the finishing machine with the crane and brought it over the forms and close to them. At that time the boom was three feet from the wires. Louis Manaia was watching this distance carefully. Although he thought that the wires carried about 1,500 volts, he watched them carefully, since he knew that electricity could arc from wires, without direct contact. He knew he could contact wires and that electricity was dangerous. He had put booms in wires before.

The place where Louis Manaia was to place the finishing machine was beyond (north of) the point where the concrete was to start. Had the finishing machine been set over where the concrete was to begin, the crane would not have been under the wires.[6]

For some reason not clear from the evidence,[7] apparently it was thought by Sligo to be desirable to start from the north, or Bladensburg Road, end and work south.

At this time, seven or eight men, including George Manaia, who had left the truck of the crane and had joined others in helping position the finishing machine, were holding on to it. Some one[8] then indicated that the finishing machine should be placed slightly further north and gave instructions to "boom up."

Louis Manaia then raised the boom so that it was approximately 30 inches from the lowest wire. He was watching the boom at the time so as not to come too close. He then set the brake, which would prevent any sway of the boom, or of the machine.

Within a few seconds (five, more or less) he looked and saw the decedent Lourenco "on fire." Manaia was positive that he did not touch the wires with any part of the crane, but that the current came from arcing. It was necessary to break this flow of current, but he was afraid to swing the boom and machine to either side, as it might drag the men along. Accordingly, by working one lever he picked up the load, and with another he lowered the boom.

Louis Manaia further testified that pitting, or "buckshot", indicated that the current entered the boom support lines, 10 to 15 feet below the forward end of the crane boom.

On two other occasions in 1955, Louis Manaia had put booms in wires before; had burned down one wire, and burned or pulled down another. The evidence did not make it clear what kind of wires were involved, or whether they crossed or paralleled the road; or what was the nature of the crane operations on these occasions.

6. The crane operator testified: "* * * I am bringing my point, sir, because where the concrete is—if I had to set the machine over there, I wouldn't be under the wires at all."

7. It was immaterial to Montgomery County whether the laying of the concrete began at the north or south end. Ready-mixed concrete was used. Plaintiffs contended that starting at the north and working south was more economical. If, as the Montgomery County inspector testified, it was customary to lay one lane, then skip a lane, it would appear that the laying of at least two lanes would have to start from the south.

Apparently the finishing machine was intended by Leal to be positioned north of the beginning of the concrete so that the finishing machine would not be in the way of the initial pouring. It could of course have been placed on the rails at any place and then been pushed to any desired location. The evidence made it clear that it was self-propelling, but did not indicate whether it could or could not travel in reverse under its own power.

8. There is conflict as to who gave these instructions. While perhaps important on the question of contributory negligence, in view of the court's opinion on the question of primary negligence, it is not necessary to resolve this conflict on the motion for judgment n. o. v.

## Theory of Liability

Plaintiffs concede that there is no evidence of any actual knowledge by Pepco that a crane was going to be used on Fern Street on September 2, 1955, in close proximity to its wires. They do contend that in view of the considerable building activity in and around the Wheaton area, prior to September 2, 1955; that Pepco knew that Fern Street was to be paved; that Fern Street had been graded; and that grading equipment was on that street, Pepco knew or should have known that a crane was to be or would be used on Fern Street in close proximity to its wires. Plaintiffs further contend that it thereupon became the duty of Pepco, by some means—e. g., insulating the wires, placing them underground, posting signs or notices, or giving direct notice to Sligo and/or its employees—to act to eliminate or reduce the possibility of contact between its wires and any crane that might be used.

The testimony was certainly sufficient to establish actual knowledge by Pepco that Fern Street was to be paved. It would also justify the conclusion that Pepco should have concluded that a crane might possibly, or even probably, be used in the course of the work. The critical question is whether in the exercise of the high degree of care [9] required of those whose business it is to transmit dangerous currents through wires, Pepco should have anticipated the use of a crane at the place, and in the manner in which, the crane in question was in fact operated; and should it have taken affirmative steps to warn the plaintiffs? In the court's opinion these questions should be answered in the negative.

## Anticipation of Probable Use

Assuming that Pepco should have anticipated the use of a crane on Fern Street, there was no reason for it to anticipate its use at the place, or in the manner, in which it was in fact operated. As previously pointed out, the same crane had previously brought the same finishing machine into Fern Street, passing under the wires, and safely deposited it on the east shoulder of Fern Street, south of the 33,000 volt wires.

In positioning the finishing machine on September 2, 1955, it was unnecessary for this work to be done under the wires. The finishing machine could have been positioned at the south end of the rails. It could have been positioned at any place on the rails. It could have been placed north of the wires, if the rails had been extended. The crane was a revolving one, and positioning could have been done with the crane south of the beginning of the concrete and to the side of the rails.

In fact, the finishing machine could have been positioned, with perfect safety, within inches of where the casualties occurred, and with the crane operating beneath the wires. The testimony makes it abundantly clear that in the positioning operation, with the wires 5 to 10 feet directly in front of the crane operator, and the boom 36 inches from the wires, the finishing machine was lowered and about to be positioned. However one or all of the plaintiffs desired it to be placed a few inches [10] to the north; that this necessitated raising the boom, bringing it within 30 inches of the wires; that this did not instantly, but after a few seconds, result in arcing.

To require Pepco to anticipate such a completely unusual and unnecessary act, in the vicinity of wires, when the work could have been done with safety at any other place, even within three feet of the wires, would require it to anticipate at its "peril every possible fortuitous circumstance under which some person might make a contact with

9. Conowingo Power Co. v. State of Maryland, to Use of Marshall, 4 Cir., 1941, 120 F.2d 870, 873.

10. If the estimate of boom elevation of 30 feet is correct, it would be at (or approximately at) a 45 degree angle, and a further elevation of six inches would move the finishing machine north approximately the same distance.

the wire, resulting in injury or death." Le Vonas v. Acme Paper Board Co., 1944, 184 Md. 16, 21, 40 A.2d 43, 45. Such is not the law.

### The Law

In a diversity case such as this, we must first look to the Maryland law. The Le Vonas case, supra, is determinative on a number of the basic, and collateral, issues. The plaintiffs, employees of an independent contractor, were engaged in moving beams with a crane having a 70-foot boom, operated by a man under their direction. While the boom was hanging motionless within four feet of the defendant power company's lines, electricity jumped to the boom and burned the plaintiffs. After stating that the defendant property owner owed "to employees of the contractor the same duty he would owe to employees of his own to furnish them a safe place to work" (184 Md. 20, 40 A.2d 45) the court continued:

"* * * In accordance with these basic principles, the law does not require that a person, who maintains even so deadly an instrumentality as a high voltage electric wire, shall anticipate at his peril every possible fortuitous circumstance under which some person might make a contact with the wire, resulting in injury or death. Hayden v. Paramount Productions, 33 Cal.App.2d 287, 91 P.2d 231; 18 Am.Jur., Electricity, Sec. 58. Electricity is now used so universally in city and country, in home and in business, for illumination and motive power, and for communication and transportation, that it is a matter of common knowledge that any line carrying electric current is dangerous to a more or less degree. The fact that a wire is charged with electric current is notice of danger, and any person mindful of his safety should treat it with caution. When a person voluntarily touches, or approaches nearer than a reasonably prudent person would, an electric wire, which he knows, or which a person of ordinary knowledge and experience would have reason to believe, is sufficiently charged with electricity to be dangerous, and in consequence thereof he is injured, it will be assumed as a matter of law that his own negligence contributed to the accident. Potomac Edison Co. v. State, for Use of Hoffman, 168 Md. 156, 161, 177 A. 163, 166.

"The law does not require an electric company to insulate its high-tension wires everywhere, but only where there is reason to apprehend that persons may come in contact with them, either in the pursuit of their calling or where they may be reasonably expected to go. In the absence of statute or ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in close proximity to them. * * *" 184 Md. 21, 40 A.2d 45.

The court cited with approval the case of State, for Use of Bahner v. Consolidated Gas, Electric Light & Power Co., 1930, 159 Md. 138, 143, 150 A. 452, stating that in that case:

"* * * where it was argued that the deceased, who was electrocuted while attempting to throw a radio aerial over an electric wire, did not know that it carried high voltage, this court declared that the deceased knew that the wire carried sufficient current for an arc light in front of his home, and that he either knew or ought to have known that his act was hazardous. In this case plaintiffs' injuries were caused by their own negligence in bringing the steel cable too near the high-tension wires to avoid the accident. Stackpole v. Pacific Gas & Electric Co., 181 Cal. 700, 186 P. 354; Hauser v. Pacific Gas & Electric Co., 133 Cal.App. 222, 23 P.2d 1068." 184 Md. 23, 40 A.2d 46.

The court affirmed the directed [11] verdicts in favor of the power company and the property owner.

The Le Vonas case has been very recently cited by the Maryland Court of Appeals as holding that there should be attributed to plaintiffs "a knowledge of the qualities of electricity and its dangers, generally known." Babylon v. Scruton, 1958, 215 Md. 299, 308, 138 A.2d 375, 380.[12]

The decision of this Circuit in Burns v. Carolina Power & Light Co., 4 Cir., 1951, 193 F.2d 525, certiorari denied 1952, 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669, likewise contains significant language. In that case the plaintiff sued to recover damages for injuries sustained

11. Near the beginning of its opinion the court said:

"At the close of their evidence, plaintiffs admitted the electric company was not liable. These appeals are from judgments * * * in favor of the paper board company." 184 Md. 19, 40 A.2d 45.

In fact, the docket entries show:

"Verdict in favor of the defendants under the instruction of the Court (Judge Dennis)."

Only the judgments in favor of the paper board company were appealed.

12. In State of Maryland, to the Use of Annie Kate Dosier, etc., et al. v. Baltimore Gas & Electric Co., in the United State District Court for the District of Maryland, Civil Action No. 10381, Judge Chesnut had occasion to consider and state the law of Maryland with respect to the duty of a utility company in the maintenance of high-voltage electric wires, from which current arced to a crane being used, allegedly on a public street, in the construction of the Baltimore Harbor Tunnel. The complaint, in its allegations of duty and breach thereof, was almost a post-graduate Chinese copy of the complaint herein. The complaint was dismissed, with leave to amend. The amended complaint was substantially verbatim the original complaint, with the omission of any claim that statutes and regulations had been violated. The motion to dismiss the amended complaint was denied, the court suggesting that the defendant file affidavits as to the nature and duration of construction, and move for summary judgment. In dealing with the contention that there was an obligation to post notices, Judge Chesnut said:

"* * * That would seem to me to leave only one question which you are advocating here, and that is the necessity of the Baltimore Gas & Electric Co. to post notices with regard to the amount of current in these wires; and, as to that, Mr. Coughlan, I would say, now, I do not know of any law in Maryland that requires them to do that. On the contrary, I think the Maryland law is definitely to the contrary. Persons who come in proximity to high-power electric wires, whether they be of the Baltimore Gas & Electric Co. or of the Pennsylvania Railroad, with which we are so familiar and of which we have notice, in the papers this morning, of another disastrous accident—people are charged with knowing, when they come into contact or proximity with those wires, particularly, that they are dealing in a dangerous place and in a dangerous situation; and I do not know of any obligation to post such a notice on the wires or poles, or by public notice. On the contrary, it is my view in regard to that particular issue in the case, that under the Maryland decisions there is no obligation to do that."

He repeated that the only point he could see likely to come up "is, whether there is any obligation on the part of the defendant to give notice of the existence of these high-tension wires; and, as to that, I understand the Maryland law clearly to be that there was no such necessity."

Thereafter defendant filed a verified answer with exhibits, and moved for judgment on the pleadings or in the alternative for summary judgment. · The motion was denied because of the general allegation of "negligence", the court however saying:

"* * * The specific matter which they allege, to-wit, the failure of the defendant to hang notices on the wires, or to bring, or cause to be brought to the public's attention by notice that the wires contained larger amounts of electricity, is not, of itself, negligence. That is clear enough, under the Maryland law.

"Furthermore, the suggestion which has been made that the defendant knew that workmen—contractors—were engaged in and around and about the high-potential electric wires, is not something which constitutes negligence on the part of the Gas Company. The Gas Company is not required to seek out the people and tell them what should be obvious to them. * * * *"

when the boom of a crane came in contact with overhead power lines of defendant, current being conducted through metal lines which plaintiff was holding. The 45-foot boom of a clam shell bucket had been lowered to replace a block. While plaintiff was standing on the ground holding a metal line, the crane operator Daley raised the boom into the bare wires more than 20 feet off the ground. In sustaining a directed verdict for the defendant, the court said:

"Prior to the accident, it seems, no crane or similar equipment had ever been operated at the brick yard beneath the transmission line, nor had any other operations thereof taken place under the line within Power Company's right of way. Power Company had no actual knowledge that a crane was being operated in connection with the unloading of coal at the coal trestle, which was located more than 150 feet on the north side of its line. Moreover, a crane had apparently never been used for that purpose until a few weeks prior to the accident, when a crane was employed there because of an emergency resulting from coal strikes. There appears to have been no necessity for that crane to be operated beneath Power Company's line or nearer to it than its place of use at the coal trestle. Despite the allegations in the complaint, the presence of the crane beneath the line at the time of the accident is not satisfactorily explained by the evidence. The manager of the brick yard testified that there was no reason or necessity for it to be there on that occasion. The transmission line was in open and unobstructed view, and upon cross-examination, Burns and J. M. Daley each testified that, although he did not see the wires prior to the accident, he could have seen them if he had looked, but he did not look." 193 F.2d 527.

"* * * We prefer, however, to rest our decision on the fact that there was not sufficient evidence showing negligence on the part of the defendant, Power Company, to take this question to the jury.

"Very similar, on both the facts and the issues, to the case before us was Croxton v. Duke Power Co., [4 Cir.], 181 F.2d 306, (decided by our Court). In the Croxton case, plaintiff came into contact with the wire by virtue of his being on the roof of a barn, constructed on defendant's right of way without defendant's knowledge; in the case now before us, the hoisting of the boom of the crane (hardly foreseeable by defendant Power Company) brought about contact with the overhead wire. What we said in the Croxton case about foreseeability, failure to insulate and to post warning signs should apply equally to the instant case. * * *" 193 F.2d 528.

Both Le Vonas and Burns cited in support of their decisions the case of Stackpole v. Pacific Gas & Electric Co., 1919, 181 Cal. 700, 186 P. 354. The language of the California Supreme Court is so apt that it is desirable to quote it at more than usual length. The court in affirming a nonsuit said (186 P. 355–356):

"The second ground upon which the motion for nonsuit was made was that negligence on the part of the defendant did not appear. The facts, as shown by the evidence, are: The defendant is a light and power company, and, as a part of its plant, maintained a power line of 2,300 volts carried on poles along the side of a country road in Marin County. The line was carried 22 feet or more above the ground on cross-arms, which, in addition to the power wires, carried two other wires, either telephone or telegraph. The wires were originally insulated, but the insulating material had come loose and in places was hanging in strips. The decedent's employer, Price, obtained a contract from the county to put in a bridge on the

road. To do this work Price wished to drive some piles, using a pile driver. The piles were to be driven beside the roadbed, and the wires of the pole line of the defendant were so close that it was necessary to move them in order to place the pile driver, extending above them, in position. Price several times spoke to the local agent of the defendant about moving the wires, and he agreed to move them, but it was not done. Price finally, without waiting any longer for the wires to be set back, proceeded to move the pile driver in. In the course of doing this, it either came in contact with a power wire or came so close to it as to establish a connection between the wire and a wire cable running over the sheave at the top of the pile driver, with the result that the current passed down the cable and killed the decedent, who had hold of the cable on the ground. Both Price and his foreman knew that the wires were power wires.

"It is perfectly apparent from the foregoing facts that the proximate cause of the decedent's death was not any negligence on the part of the defendant, but was in the negligence of Price in moving in the pile driver before the wires had been set back so as to avoid danger. The fact that the defendant delayed setting back the wires, although it had promised to do so, or even though we assume it was its duty to do so, is wholly immaterial. The utmost responsibility which would attach to defendant for such delay would be to compensate Price for the consequent delay in his work. But it was not the delay in setting back the wires that killed the decedent, but the moving in of the pile driver before they were set back and were safely out of the way.

"Plaintiff's counsel contend that the defendant was negligent in maintaining a high-voltage line along the highway without placing upon the post or cross-arms any sign indicating that the line was a high-voltage line. But no sign was needed; for the fact that it was a power line must have been evident, and in the present case was actually known. Price and his foreman testified that they knew it, but they did not know it was carrying a voltage as high as 2,300 or any voltage so high as to be dangerous to life. But it is a matter of common knowledge that any line carrying electricity for power is dangerous to a more or less degree, and here Price's foreman testifies that just prior to moving in the pile driver he called up the defendant's power house and inquired the voltage of the line, and that the person who answered said he was not familiar with the particular line, but that they had lines in that vicinity carrying 2,300 volts and others carrying 110. In the light of this information that the line might be carrying 2,300 volts, Price, to put it very mildly, was not reasonably justified in moving in the pile driver, and the responsibility for any accident resulting from his doing so is solely his, and not the defendant's. The situation is not helped by the fact that the insulation on the wire had come loose and was hanging in strips. Observing this, Price must have known that there would be no protection from the insulation, and should have been doubly careful.

"It follows that the nonsuit was properly granted upon the second ground urged."

In Croxton v. Duke Power Co., 4 Cir., 1950, 181 F.2d 306, 308, that Circuit cited with approval Lewis v. Pacific Gas & Electric Co., 1949, 95 Cal. App.2d 60, 212 P.2d 243. The plaintiff's decedent had been employed by a construction company which was installing an underground sewer, which was being laid parallel to the southerly edge of a public street, along the same edge of which the defendant electric company

maintained a high-voltage power line at approximately 26 feet above the ground. Decedent was assisting in moving pipe. A self-propelled crane with a 26 foot boom was employed. The boom, after releasing a section of pipe, swung and struck a power line, electrocuting the decedent. Neither decedent nor the crane operator had worked on the job prior to that morning, and neither knew the voltage of the power lines; the crane operator stating that it was assumed they were 400-volt lines, since they appeared small, and to run to a small pump house. No warning signs were posted. The defendant electric company knew that the sewer line was to be installed. Nevertheless the court sustained a judgment of nonsuit at the end of plaintiffs' case, saying (212 P.2d 245):

"It is appellants' contention that the evidence establishes without contradiction that for several months prior to the time of the fatal accident defendant knew of the construction work; that it knew such work would involve the use of a crane and knew or should have known that the particular crane in actual operation was being used; that no warning signs were attached to the high power lines, and that such evidence posed a question of fact as to whether or not defendant had violated a duty it owed decedent which violation was the proximate cause of his fatal injury.

"* * * [T]he phrase 'legal duty' does not mean that one who maintains high voltage lines must anticipate at his peril every possible accident which might occur. Sweatman v. Los Angeles Gas & Electric Corp., 101 Cal.App. 318, 281 P. 677. However, it does mean that if from all of the circumstances it could reasonably have been anticipated that an accident of the general nature of that which killed decedent herein would occur, then defendant failed in its duty to use proper care by its failure to warn of the high voltage lines. In other words the duty of care is that duty which is commensurate with and proportionate to the reasonable foreseeable consequences.

"The record, when examined in the light of such rule, does not sustain appellants' contention. Mere knowledge alone that public improvements are to be made is insufficient. Thus, although it does appear that the defendant had knowledge of the proposed construction of the sewer project, there is nothing in the record indicating that it knew or should have known that a crane of the type then being operated by the decedent's employer would be so used, that a crane was customarily used in such construction work or that if a crane were to be employed it would be so used near defendant's power lines."

That knowledge of proposed road improvements does not impose an obligation to warn of the danger of wires, or to anticipate that a crane would be operated in dangerous proximity to them, was held in American General Ins. Co. v. Southwestern Gas & Elec. Co., 5 Cir., 1940, 115 F.2d 706. The subrogee's decedent had been working on a culvert in road construction about four hours when the operator of a dragline swung the 45-foot boom of his crane into, or into close proximity with the 11,500 volt lines of defendant, which were 35 feet, 10 inches above ground, electrocuting decedent.

Previously, the county commissioners and representatives of defendant had conferred on building plans; defendant agreed to relocate its poles and lines to accommodate road construction when notified; and several days before the casualty, defendant had been notified that the next section to be cleared was the one on which the casualty occurred. On the day of the casualty, a civil engineer of defendant was at the location surveying, and setting stakes, preparatory to the relocation of fifteen poles. At the time of the casualty he was going toward the dragline crew to warn them not to get too close to the wires.

In affirming a directed verdict for defendant, the Court of Appeals said (115 F.2d at page 708):

"The appellants contend that Southwestern Gas & Electric Company was negligent in not warning Jones of the danger of the boom coming in contact with its wires, and that this negligence was the proximate cause of his death. * * * In the case at bar Jones was not an employee of the defendant electric company or of a contractor doing work for it. Jones was not engaged in any work beneficial to the defendant, and was in no wise an invitee of Southwestern Gas & Electric Company.

"Of course the defendant was under a duty not to wilfully injure Jones. It was also under a duty to erect its poles and maintain its lines so as to guard against injury to persons using the highway. An electric company must exercise reasonable care to avoid injuries, and take such precautions 'as the dangerous nature of its agency would render reasonably necessary and prudent.' Jacksonville Ice & Electric Co. v. Moses, 63 Tex.Civ.App. 496, 134 S.W. 379, 382; Canyon Power Co. v. Gober, Tex.Civ.App., 192 S.W. 802; Smith v. Appalachian Electric Power Co., 4 Cir., 74 F.2d 647; Mississippi Power & Light Co. v. Whitescarver, 5 Cir., 68 F.2d 298; Yarn v. Ft. Dodge, D. M. & S. R. Co., 8 Cir., 31 F.2d 717.

"The mere fact that Jones was injured by a current of electricity flowing from the power lines does not give rise to a cause of action against the defendant. It was necessary for the plaintiffs to prove that Jones was injured as the consequence of some negligent act on the part of the Southwestern Gas & Electric Company. This they did not do. The lines were erected along the defendant's own private right-of-way, and they were maintained at an elevation of 34 feet 10 inches, much higher than required by statute and ordinary safety regulations. The plaintiffs have shown no negligence whatever on the part of the defendant. It is clear that Southwestern Gas & Electric Company could not reasonably foresee that Texas Bitulithic Company would negligently run its metal crane against the high tension lines. The negligence of the employees of Texas Bitulithic Company was the sole cause of the accident and the court properly instructed a verdict for the defendant. * * *"

Upon the foregoing authorities, and for the reasons stated, Pepco's motion for judgment notwithstanding the verdict is granted. It therefore becomes unnecessary to consider its alternative motion for a new trial.