WARREN ROGERS, Plaintiff and Respondent, *v.* HILGER CHEVROLET COMPANY, a Corporation, Defendant and Appellant.

No. 11621.
Decided March 3, 1970.
Rehearing Denied March 24, 1970.
465 P.2d 834.

(1)

Leonard H. Langen, argued, Glasgow, Keller, Magnuson, Reynolds & Drake, Helena, Paul F. Reynolds, argued, Helena, for appellant.

Gene Huntley, Baker, Hughes & Bennett, Helena, Joseph C. Connors, argued, Helena, for respondent.

MR. JUSTICE BONNER delivered the Opinion of the Court.

Plaintiff, Warren Rogers, brought this action against defendant, Hilger Chevrolet Company, for personal injuries sustained when he fell out the door of an automobile owned by defendant while taking a test drive. The jury returned a verdict in plaintiff's favor in the sum of $25,000, and defendant appeals from the verdict and from the final judgment.

Defendant owns a car lot located in Glendive, Montana. On the morning of March 14, 1966 plaintiff, his wife and their three children went to defendant's used car lot. They were looking at cars as prospective purchasers. They were shown a 1960 Ford station wagon which plaintiff decided to test drive. Plaintiff's wife drove the car and plaintiff sat in the front on the passenger side. The three children sat in back. They drove out of Glendive for about 3 miles and then returned to defendant's lot. The trip was uneventful and plaintiff returned the car to defendant without noticing any defects in it.

The following day plaintiff and his family returned to defendant's lot and again obtained the keys to the same 1960 Ford

station wagon. After assuming the same positions they occupied on the previous day they proceeded to again test the car. On this occasion the plaintiff noticed that upon shutting his door it did not catch. The apparent reason was that the Ford was parked quite closely to another car and plaintiff asked his wife to drive forward. Upon clearing the other car plaintiff again shut the door and this time the door shut satisfactorily.

This second day of testing the car was for the purpose of determining whether the car used any oil. The plaintiff had a method he used for making this determination. The method consisted of going to the top of a hill and then driving the vehicle down the hill at about 25 M.P.H. with the throttle shut down until reaching the bottom and then stepping on the throttle quickly. If there is oil consumption it will show in the form of a blue cloud of smoke.

Plaintiff and his family proceeded to a steep hill in Glendive to make the test. While his wife drove, plaintiff sat on the passenger side in a sideways position with his left arm on the back of the seat and his right arm out the window. His fingers were apparently clutching the rain gutter. The hill was traversed without any trouble and no smoke was perceived by plaintiff at the end of the test. However it was decided that the test should be repeated because the heat gauge indicated that the car was not sufficiently warm on the first test. In order to return to the top of the hill plaintiff's wife had to make two left turns. The first left turn was made without incident. However upon making the second turn at about 10 miles per hour the plaintiff testified that the door on his side jerked open and jerked him with it. As a result he was slammed against the pavement and sustained severe injuries. Subsequently he has not been able to perform his usual work and he has lost a considerable amount of wages because of the injuries.

The automobile was returned to the lot by plaintiff's wife after she had taken him to the hospital. Thereafter on March

17, 1966, plaintiff's wife returned to the defendant's lot and purchased the car from which he had fallen out.

The plaintiff contended at the trial court and contends here that the defendant breached its legal duty to exercise ordinary care by allowing plaintiff to ride in a defective vehicle which was represented to be in good condition.

The defendant has contended throughout that it had not breached any legal duty and there was no proof of any defect in the door of the car.

At the close of plaintiff's case defendant moved for a directed verdict pursuant to Rule 50(a), M.R.Civ.P. This motion was renewed at the close of all the evidence, in both instances being denied.

Defendant raises several issues. However for purposes of this decision only the denial of the motions for a directed verdict will be reviewed.

The law in Montana is well settled as to a cause of action in negligence and the amount of evidence required to sustain a verdict in such a cause. In Mang v. Eliasson, 153 Mont. 431, 458 P.2d 777, we recognized the rule that to sustain a recovery the evidence relied upon, whether direct or indirect, must be substantial—more than a scintilla. We also noted that a verdict cannot rest upon conjecture, however shrewd, nor upon suspicion, however well grounded, and further stated:

"While the jurors are the sole judges of the facts the question of whether or not there is substantial evidence in support of plaintiff's case is always a question of law for the court."

In the case at bar the question has arisen as to whether there is substantial credible evidence in support of plaintiff's case.

In viewing the evidence we must do so in the light most favorable to the plaintiff. Strong v. Williams, 154 Mont., 65 460 P.2d 90.

Plaintiff testified that the first day he tested the car an employee of defendant told him that the car was in good shape. He also said that no one informed him of any defects in the car.

On the day of the accident he said that the allegedly defective car was parked close to another car and that he had to have his wife pull ahead to close the door properly. He stated that the first time he attempted to close the door it did not close properly but this was because he could not slam it hard enough to engage the latch. Upon being asked to describe his position in the car plaintiff did so in this manner:

"Q. Now, you were in the passenger side? A. Yes.

"Q. And how were you sitting in the car?

"A. Sort of sideways in the car so I could watch the heat gauge and the back window.

"Q. Where did you have your left arm? A. On the back of the seat.

"Q. Where did you have your right arm? A. Out the open window, and up at the top of the door."

He emphasized that he was not touching the door nor was he touching the door handle. He said that he was leaning forward to look at the heat gauge. Then he described the events just prior to and during the accident.

"Q. You turned to the left to go up and come down the same hill? A. Yes.

"Q. And did you go around the corner all right? A. Yes.

"Q. And then what happened? A. Then we had to make another left to finish going back up the hill, and just as she made the—

"Q. Just a minute now. How sharp a corner was this other left-hand corner now, the second one, that you're just now starting to negotiate—was it 90 degrees? A. It's quite sharp, yes.

"Q. Did you have to turn more than 90 degrees to get around it? A. Yes.

"Q. And your wife did start to make a left turn around it, is that right? A. Yes.

"Q. Now, when she came into the corner, how fast was she going? A. Oh, possibly 10 miles per hour.

"Q. Were you still in this same position that you've described to the jury? A. Yes.

"Q. Well, what happened then as the car came into the corner? A. She started to make the corner.

"Q. Yes? A. And that's when the door jerked open.

"Q. I see. What happened? A. The door came open.

"Q. Yes. And then what happened? A. It jerked me right out with it."

He then went on to say that he retained a grip on the door after he fell out but his hip struck the ground twice and in this way he sustained his injuries.

Plaintiff was in the hospital until March 17, 1966 and his wife then took him home. He was driven home in the same car in which he was injured which his wife had purchased from defendant that morning. Plaintiff stated that he used the car for some two years after purchasing it and the doors never failed to function there-after. He did state that some six months after the car was purchased he had occasion to take the front door apart. At this time he stated that the inner door was extremely oily and dusty.

Both plaintiff's wife and his older daughter testified at the trial. The testimony elicited from both was basically the same as that of plaintiff.

The former owner of the car was called on behalf of plaintiff. He testified that he had the doors adjusted while he owned the car. He also said that sometimes he had to bang the doors a lot because they were hard to close, especially during cold weather. He stated also that at the time he traded the car to defendant, the employee with whom he was dealing knew him and knew his occupation as a traveling salesman.

A body shop owner from North Dakota was called and he stated that he had worked on the car doors for the former owner but did not recall what he did other than that he probably spent 15 minutes oiling the cogs which make up the door catch. This witness was qualified as an expert and he stated that it was his

opinion that the door had come open because the latch was oily and dusty. The reason he gave for this opinion was that a lot of roads upon which the car had been driven were dirt roads and the previous owner of the car was a traveling salesman. On cross-examination he stated that an adequate test of the door, as to its reliability, would be to close it securely and then pull on the door handle several times without activating the release.

After plaintiff had rested his case the defendant then proceeded to present its case. Several of defendant's employees were called and testified. All of them stated that they had made tests on the door directly after the car was returned to the car lot by plaintiff's wife on the day of the accident. These tests were composed of closing the door and then applying pressure on the door either from the inside or from the outside without activating the release. This was done several times and all of the witnesses stated that the door did not come open during such tests.

One of defendant's witnesses was Mr. Wesley Madsen, whose job was to check over used automobiles that had been traded in and were to be resold. He testified that he recalled the car in question had been checked over by himself. He stated that he did not make any repairs to the car's right front door nor did he find any defects in it. He also enumerated the routine which he went through with every tradein. This routine included cleaning any surface dirt that might be on the doorlatches.

The testimony of defendant set forth above was not disputed in any way by the plaintiff. Nor does it conflict with plaintiff's evidence. Viewing the evidence in the record in the light most favorable to the plaintiff, who was the prevailing party in the lower court, it is the opinion of the Court that there is no substantial credible evidence to sustain the plaintiff's recovery.

Nowhere in the record is there any indication of defendant doing any negligent act or negligently omitting to do an act. Plaintiff desires this Court to believe that defendant was negli-

gent in allowing plaintiff to test drive the car while defendant knew or should have known of some defect in the door latch. But there is not one shred of evidence pointing to any defect in the car door latch. Plaintiff's expert witness, upon being asked a hypothetical question containing many of the facts of this case, stated that he believed the door had come open because it had a dirty lock. But where is the evidence of a dirty lock? Six months after the plaintiff had purchased the car he states that he took the door apart and found it oily and dirty. This is six months after the accident and not once after the accident did the door come open without first releasing the catch. Plaintiff's own expert witness, in testifying as to why the dirt is on the lock, said this:

"Q. The dirt—ascribing the dirt to the condition? A. Well, because as they come from the factory they're packed with grease, and they always, in a matter of time, dirt gets in there, and this roller won't spin freely, *it will work and it won't work, it will work sometimes,* bang it; and the same with on the inside of the door, there is quite a little to that same mechanism, it gets clogged with dirt.

"Q. Now, if it's clogged with dirt then would the locking mechanism necessarily be defective? A. *Well sometimes it would work, and sometimes it don't.*" (Emphasis supplied.)
It is completely beyond the realm of this Court's imagination how negligence can be ascribed to this defendant for allowing plaintiff to use a car with an allegedly defective door, when the only evidence of such defect is in speculation of one of the witnesses that dirt *might* be the reason for the door to unexpectedly come open.

Neither of the parties here are in disagreement as to the basic law which governs defendant's duty to the plaintiff. Defendant's duty was to discover and repair any defects which were patent or discoverable in the exercise of ordinary care. Egan Chevrolet Co. v. Bruner, 102 F.2d 373, 122 A.L.R. 987 (8th Circuit) (1939). Plaintiff's evidence failed to show any

breach of the above enumerated duty. Rather his evidence, at the most, allowed the jury to speculate as to the cause of the accident. Defendant did not warn plaintiff of any defects because it is obvious from the record defendant did not have any knowledge of a defect. Defendant's employees checked the automobile over and this check included the right front door. Defendant's duty does not extend to completely dismantling an automobile and then reassembling it before its resale.

Viewed in the light most favorable to plaintiff, we hold that under the rules above enumerated the evidence at the close of plaintiff's case wholly failed to show a breach of duty and therefore did not establish a prima facie case of negligence on the part of the defendant as alleged. Consequently, we hold that the trial court erred in its refusal to grant defendant's motion for a directed verdict.

The judgment of the district court is reversed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES CASTLES, JOHN C. HARRISON, and HASWELL, concur.