Rozell PATTON and Beverly Patton,
Plaintiffs/Appellants,

v.

Jesse McHONE, Harpeth Toyota, Inc.,
and Ford Motor Credit Co.,
Defendants/Appellees.

No. 88–1652–ii.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

July 17, 1991.

Permission to Appeal
Denied by Supreme Court
Dec. 30, 1991.

Joseph H. Johnston, Nashville, for plaintiffs/appellants.

William Carter Conway, for defendant/appellee Harpeth Toyota.

Alexander, Conway & Williams, Franklin, John E. Buffaloe, Jr., Nashville, for defendant/appellee Ford Motor Credit Co.

KOCH, Judge.

This appeal involves a used car that had been damaged extensively prior to its sale. The buyers requested rescission of the contract when they discovered the damage and the faulty repairs shortly after purchasing the car. After their requests for rescission were rebuffed, the buyers filed an action in the Chancery Court for Davidson County against the prior owner of the car, the dealer, and the financing company. The trial court, hearing the case without a jury, awarded the buyers a judgment against the prior owner of the car but dismissed their claims against the dealer and the financing company. The trial court also awarded the financing company a deficiency judgment against the buyers. The buyers have appealed, taking issue with the deficiency judgment and the dismissal of their claims against the dealer and the financing company. We find that the buyers are entitled to relief against the dealer and the financing company. Therefore, we reverse the deficiency judgment and the dismissal of the buyers' claims against the dealer and the financing company.

### I.

On July 14, 1986, Harpeth Toyota, Inc. purchased a used 1985 Honda Prelude from Ralph LaFevor, an individual who repaired cars as a sideline in his garage at home. Harpeth Toyota's used car manager inspected the car while it was being repaired, and Mr. LaFevor informed him that the car's roof, trunk lid, and rear windshield had been damaged by a falling tree limb.[1]

Harpeth Toyota sold the car "as is" to Jesse McHone on February 6, 1987. Mr. McHone did not inquire into the background of the car, and Harpeth Toyota did not volunteer any information about it. Mr. McHone financed the car through Credithrift of America, Inc.

The car was involved in another accident on March 9, 1987. Mr. McHone paid more than $5,200 to repair the car and later pled guilty to a DUI charge stemming from the accident. As a result of his conviction, Mr. McHone lost his driver's license and his job. Since he could no longer drive or afford the monthly car payments and increased insurance premiums, Mr. McHone parked the car in a church lot on Gallatin Road and placed a sign in the front windshield offering to sell the car to anyone who would agree to assume his monthly payments.

Beverly Patton saw the car parked in the church parking lot. She contacted Mr. McHone and became interested in buying the car after driving it. Mr. McHone told

---

1. In fact, the car had rolled over during an accident in Alabama on March 26, 1986. The driver's insurance company acquired the car after determining that repairs would cost approximately $7,500 and that the car's scrap value was between $1,500 and $2,500. The car passed through other hands before Mr. LaFevor purchased it, and there is no evidence that Mr. LaFevor knew how the car had been damaged.

her that the car was "the best car he had ever owned" and that he had not had any problems with it. He did not, however, tell Mrs. Patton that the car had been involved in an accident. Mrs. Patton also inquired about an extended service contract. Mr. McHone had not purchased one when he bought the car, but he told Mrs. Patton that she could probably buy one from Harpeth Toyota.

A series of discussions between Mrs. Patton, Mr. McHone, Harpeth Toyota, and Credithrift followed. Mrs. Patton finally agreed to refinance the car after she and Mr. McHone were informed that Mr. McHone would remain liable on the Credithrift note even after Mrs. Patton assumed it. Mrs. Patton and her husband also agreed to pass the transaction through Harpeth Toyota's books [2] in order to purchase an extended service contract, to avoid paying additional taxes, and to obtain financing through Ford Motor Credit Corporation ("Ford Credit").

Harpeth Toyota paid off the Credithrift note, and on June 22, 1987 Credithrift discharged its lien and assigned the car's title to Harpeth Toyota. On June 25, 1987, Harpeth Toyota prepared the following documents: (1) a retail installment contract listing Mr. Patton as the buyer and Harpeth Toyota as the seller; (2) a bill of sale listing Mr. Patton as the buyer and Harpeth Toyota as the seller; and (3) an application for an extended warranty on behalf of Mr. Patton. Harpeth Toyota also placed an endorsement on the car's title stating that Mr. Patton was the new owner, that Harpeth Toyota was the seller, and that Ford Credit was the new lienholder.

Harpeth Toyota earned $1,163.13 on the transaction. While it made no profit from the car itself, it earned (1) $532.78 from arranging the Pattons' financing with Ford Credit, (2) $200 as a commission for the sale of the extended warranty, and (3) $430.35 as a commission on the credit life and disability insurance.

On June 27, 1987, the car stalled after the Pattons' son drove it over a pothole. When the car could not be restarted, Mrs. Patton had it towed to King's Automotive, a Nashville repair shop specializing in Hondas. King's Automotive discovered that the car had a cracked block and a bent frame and that the timing chain had broken and had fallen into the engine. It informed Mrs. Patton that the car had been damaged earlier and that the damage had been improperly repaired. It also informed Mrs. Patton that the repairs would cost $2,132.11 but that the car "would never be right."

The Pattons contacted the warranty company and learned that the warranty would cover only the repairs to the timing chain. Thereafter, they requested Harpeth Toyota to take the car back and to rescind the contract, but Harpeth Toyota told them that it had a policy against rescinding sales contracts. They also requested Ford Credit to rescind the contract, but Ford Credit simply referred them back to Harpeth Toyota.

With matters in this state, the Pattons' lawyer arranged for Ford Credit to repossess the car. Ford Credit sold the car at a private sale for $3,950 and then demanded that the Pattons agree to pay the $7,341.15 deficiency. The Pattons declined and on June 23, 1988 filed suit against Harpeth Toyota, Ford Credit, and Mr. McHone, alleging fraud, breach of the implied warranty of merchantability, and violations of the Tennessee Consumer Protection Act and the Magnuson–Moss Act.

The trial court found that Mr. McHone wrongfully failed to disclose that the car had been extensively damaged in an accident and awarded the Pattons a $6,650 judgment against him.[3] The trial court also dismissed the Pattons' claims against Harpeth Toyota and Ford Credit, awarded Ford Credit a judgment against the Pattons for $7,341.15 and reasonable attorneys

---

2. The owner of Harpeth Toyota referred to this practice as "flipping" and stated that he could not recall participating in another transaction like this one "in the 20 years that I've been in the sales field."

3. There has been no appeal from this portion of the judgment.

fees, and then dismissed all remaining cross-claims and third-party claims.

## II.

The threshold question in this case is a factual one concerning Harpeth Toyota's role in the transaction. Harpeth Toyota claims that it was in "no way" involved in the sale and asserts that the transaction was solely between Mr. McHone and Mr. Patton. The evidence, however, belies this argument and preponderates against the trial court's finding that Mr. Patton bought the car from Mr. McHone. Mr. Patton bought the car from Harpeth Toyota both in law and in fact.

### A.

■ Mr. Patton and Mr. McHone agreed initially that Mr. Patton would assume Mr. McHone's Credithrift loan. However, they changed the transaction upon learning that Mr. McHone would remain liable on the Credithrift note and that Mr. Patton could obtain an extended service contract through Harpeth Toyota. They finally agreed that Mr. Patton would "refinance" the car in order to relieve Mr. McHone of any further liability and that Mr. Patton would obtain his financing and extended service contract through Harpeth Toyota.

Accordingly, Harpeth Toyota paid off Credithrift and on June 22, 1987 listed itself as the "new owner" on the car's title certificate. Three days later, Harpeth Toyota executed a "car invoice and bill of sale" certifying that it had "sold" the car to Mr. Patton and warranting that it was "the lawful owner thereof with a good right to sell same." At the same time, it prepared a retail installment sales contract naming itself as the seller, and it endorsed the title certificate showing itself as the seller, Mr. Patton as the new owner, and Ford Credit as the lienholder.

Harpeth Toyota also sold Mr. Patton a "Supersafe" two-year or 24,000 mile extended service agreement costing $360 as well as credit life and disability insurance

costing $1,075.87. Its commissions on these transactions, taken with its commission for arranging Mr. Patton's financing with Ford Credit, earned Harpeth Toyota $1,163.13 on the transaction.

### B.

For the purposes of the Uniform Commercial Code, a "seller" is a "person who sells or contracts to sell goods," and a "merchant" is a "person who deals in goods of the kind ... involved in the transaction." *See* Tenn.Code Ann. §§ 47–2–103(1)(d), 47–2–104(1) (1979). A "sale" consists of the "passing of title from the seller to the buyer for a price." *See* Tenn.Code Ann. § 47–2–106(1) (1979).

For the purposes of the Magnuson–Moss—Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301–2312 (1982) ("Magnuson–Moss Act"), a "supplier" is "any person engaged in the business of making a consumer product directly or indirectly available to consumers." [4]

It is difficult to understand how, in the face of the facts, Harpeth Toyota can assert that it was only "assisting" Mr. Patton in refinancing the car and in obtaining an extended service contract. Harpeth Toyota became the record owner of the car on June 22, 1987 and sold the car to Mr. Patton on June 25, 1987 at a $1,163.13 profit. It follows that Harpeth Toyota was not only a "merchant" but also a "seller" and a "supplier" for the purposes of the Uniform Commercial Code and the Magnuson–Moss Act. Its liability to Mr. Patton must be measured accordingly.

### III.

■ The Pattons' fraud and consumer protection claims rest on the belief that Harpeth Toyota had a duty to inspect the car prior to the sale and to inform them that it had been extensively repaired or rebuilt. Used car dealers have a duty to inspect the cars they sell and, in some circumstances, to disclose the condition of

---

4. There is no dispute in this case that the car is a "consumer product," or that Mr. Patton is a "consumer," or that Harpeth Toyota is a "mer-

chant" engaged in the business of making used automobiles available to consumers.

the car to their customers. However, the Pattons have failed to prove the existence of any of the circumstances that would have obligated Harpeth Toyota to inform them that the car had been rebuilt.

### A.

■ A seller's duty to disclose information concerning the condition of a product arises from its superior knowledge of the product. Accordingly, any analysis of a seller's duty to disclose should first begin with the seller's duty to acquaint itself with the condition of the goods and products it sells.

■ The existence and scope of a seller's duty to inspect its products depends on the product involved and the condition in which the product is sold. Thus, the limits of the duty depend upon whether the product is new or used, whether the product is in a sealed container or capable of being inspected, whether the product becomes unreasonably dangerous if defective, or whether the seller alters the product before the sale. The scope of the duty may also be affected by the nature of the seller's relationship with the buyer and the seller's representations or warranties concerning the condition of the product.

Neither the state nor the federal statutes or regulations affirmatively require used car dealers to inspect their cars prior to sale.[5] In the absence of statutory inspection requirements, we must look to judicial precedents for the nature and scope of a used car dealer's duty to inspect its cars.

The courts considering the issue have recognized that used cars are more likely to have mechanical defects than new ones and that used car dealers are in a better position to discover these defects than their average customer. *Ikerd v. Lapworth*, 435 F.2d 197, 201–02 (7th Cir.1970); *Chamberlain v. Bob Matick Chevrolet, Inc.*, 4 Conn. Cir.Ct. 685, 239 A.2d 42, 47 (1967); *Gaidry Motors v. Brannon*, 268 S.W.2d 627, 628–29 (Ky.1953).

**5.** The Federal Trade Commission removed the "known defects" disclosure requirement from its used car rules in part because the rules were

■ While used car dealers are not insurers of the cars they sell, *see* 15 *Blashfield Automobile Law & Practice* § 486.23 (3d ed. 1969), they have the duty to make a reasonable inspection of a vehicle to discover defects or conditions that could render the car defective or dangerous. *Treadwell Ford, Inc. v. Campbell*, 485 So.2d 312, 316 (Ala.1986); *Gaidry Motors v. Brannon*, 268 S.W.2d at 628–29; *Barker v. Phoenix Ins. Co.*, 220 So.2d 720, 724 (La. Ct.App.1969); *Crothers v. Cohen*, 384 N.W.2d 562, 564 (Minn.Ct.App.1986); *Rogers v. Hilger Chevrolet Co.*, 155 Mont. 1, 465 P.2d 834, 837 (1970); 2 L. Frumer & M. Friedman, *Products Liability* § 6.03[3] (1991).

■ The duty to inspect, however, does not extend to the discovery of latent defects that could not be discovered during a reasonable inspection. Therefore, used car dealers are not required to disassemble the entire car or to examine each of its component parts. *Masker v. Smith*, 405 So.2d 432, 433–34 (Fla.Dist.Ct.App.1981); *Kopischke v. First Continental Corp.*, 187 Mont. 471, 610 P.2d 668, 673 (1980); *Turner v. International Harvester Co.*, 133 N.J.Super. 277, 336 A.2d 62, 71–72 (1975). In the absence of actual knowledge of a defect, a used car dealer is entitled to rely on a test drive or on the validity of a current safety inspection sticker. *Harison–Gulley Chevrolet, Inc. v. Carr*, 134 Ga.App. 449, 214 S.E.2d 712, 715 (1975) (inspection sticker); *Rodriguez v. Ed Hicks Imports*, 767 S.W.2d 187, 192–93 (Tex.Ct. App.1989) (test drive).

### B.

■ A seller must disclose information concerning the condition of a product only when it has a duty to do so. *Simmons v. Evans*, 185 Tenn. 282, 285–86, 206 S.W.2d 295, 296–97 (1947); *Macon County Livestock Mkt., Inc. v. Kentucky State Bank*, 724 S.W.2d 343, 349 (Tenn.Ct.App.1986); Restatement (Second) of Torts § 551(1) (1976). The scope of the duty was once

not going to contain an inspection requirement. *See Consumers Union of the United States, Inc. v. FTC*, 801 F.2d 417, 423 (D.C.Cir.1986).

thought to be quite narrow. However, the influence of the *caveat emptor* rule has now been diminished by exceptions that have almost swallowed up the rule. *Bert Smith Oldsmobile, Inc. v. Franklin,* 400 So.2d 1235, 1236 (Fla.Dist.Ct.App.1981); *Burnett v. Hunt,* 5 Wash.App. 385, 486 P.2d 1129, 1130 (1971); 2 F. Harper, F. James & O. Gray, *The Law of Torts* § 7.14 (2d ed.1986). Thus, we must look to the statutes, regulations, and court decisions concerning the types of information a used car dealer must disclose to its customers.

Many aspects of the used car business are now governed by state and federal statutes. State law, for example, proscribes engaging in unfair or deceptive acts or making false or misleading representations.[6] Federal law requires disclosure of certain credit information and the existence and scope of warranties.[7] And both state and federal law require used car dealers to make accurate disclosures concerning a vehicle's mileage.[8] We have been unable to find either a state or a federal statute or regulation requiring used car dealers to disclose defects in the cars they sell.[9] Thus, we must look elsewhere for Harpeth Toyota's duty to discover defects and to disclose them to its customers.

The courts have imposed on sellers the duty to disclose the condition of their products in certain situations.[10] However, the scope of the duty is not uniform and depends on several factors, including the nature of the product, the parties' relationship, the importance of the information, and the parties' knowledge of the product's condition. *Jim Short Ford Sales, Inc. v. Washington,* 384 So.2d 83, 86 (Ala.1980).

A seller must disclose material information concerning a product's condition if it has a fiduciary or other special relationship with the buyer. *Eady v. Southern States Ford, Inc.,* 548 So.2d 180, 181 (Ala.Civ.App.1988); *Domestic Sewing Machine Co. v. Jackson,* 83 Tenn. 418, 424–25 (1885); Restatement (Second) of Torts § 551(2)(a) (1976).

In the absence of a special relationship, a seller must disclose material information about its product's condition in the following circumstances:

(1) a seller must disclose enough information to prevent its statements from being misleading;[11]

(2) a seller must give accurate answers to a buyer's questions concerning a product's condition;[12]

---

**6.** Tenn.Code Ann. § 47–18–104(b) (Supp.1990); Tenn.Code Ann. §§ 55–17–114(b)(5), –114(b)(11) (1988).

**7.** 15 U.S.C. §§ 1638, 1639 (1982); 15 U.S.C. §§ 2301, 2312 (1982).

**8.** 15 U.S.C. §§ 1981, 1991 (1982); 49 C.F.R. §§ 580.1, 580.7 (1989); Tenn.Code Ann. §§ 47–18–104(b)(16), 55–17–114(b)(10).

**9.** While the original version of the FTC's "used car" rules [16 C.F.R. §§ 455.1, 455.7 (1991) ] required the disclosure of known defects, the FTC removed this duty from the rule prior to its final promulgation. *Consumers Union of the United States, Inc. v. FTC,* 801 F.2d 417, 419 (D.C.Cir.1986).

**10.** The Pattons' brief on this point is based on this court's unpublished opinion in *Spence v. Moody,* App. No. 86–298–ii, 1987 WL 20039 (Tenn.Ct.App. Nov. 18, 1987), *perm. app. denied concurring in results only,* (Tenn. July 25, 1988). This opinion has no precedential value except to the parties in the case because the Supreme Court concurred only with the results. *Clingan v. Vulcan Life Ins. Co.,* 694 S.W.2d 327, 331 (Tenn.Ct.App.1985). While this type of disposi-
tion leaves the bench and bar guessing about the reasons for the Supreme Court's dissatisfaction with the opinion, *Pairamore v. Pairamore,* 547 S.W.2d 545, 552 (Tenn.1977) (Henry, J., dissenting), it should be sufficient to dissuade others from relying on the opinion. The Pattons' counsel may not have been aware of the status of *Spence v. Moody* because he failed to comply with Tenn.Ct.App.R. 12(b) by not placing the case's subsequent appellate history on the cover of the opinion that was included in the appendix to the brief.

**11.** *Akbari v. Horn,* 641 S.W.2d 506, 508 (Tenn.Ct. App.1982); Restatement (Second) of Torts § 551(2)(b) (1976); W. Keeton, *Prosser and Keeton on The Law of Torts* § 106, at 738 (5th ed. 1984). Thus, this court determined that it was misleading for a dealer to tell a customer that a car was "new" without also telling the customer that the car had also been in an accident and repaired. *Paty v. Herb Adcox Chevrolet Co.,* 756 S.W.2d 697, 699–700 (Tenn.Ct.App.1988).

**12.** *See Pietramale v. Dugay,* 714 S.W.2d 281, 283 (Tenn.1986); Restatement (Second) of Torts § 552.

(3) a seller must disclose any condition or defect that it knows or should know about that renders the product defective or dangerous; [13] and

(4) a seller must disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.[14]

A used car dealer's duty to disclose information concerning a car's condition is tempered by the buyer's corresponding responsibility to inspect the car before purchasing it. Sellers need not disclose inconsequential information or conditions that would be discovered by anyone examining the car. A dealer need only disclose the defects or conditions that it has no reason to believe the buyer will discover. *Stapinski v. Walsh Constr. Co.*, 178 Ind. App. 623, 383 N.E.2d 473, 477 (1978).

Harpeth Toyota did not have a fiduciary or other type of special relationship with the Pattons, and the Pattons failed to prove the existence of any of the circumstances that would have required Harpeth Toyota to disclose that the car had been damaged and repaired. The Pattons were relying chiefly on Mr. McHone's representations concerning the car's condition; in fact, they never asked Harpeth Toyota about the car, and Harpeth Toyota never made any representations about the car. Under the facts of this case, Harpeth Toyota could reasonably have concluded that the Pattons, through Mr. McHone, had acquainted themselves with the car's condition.

Even though the car had been repaired substantially following two accidents, there is no proof that Harpeth Toyota knew or should have known about the second accident. Similarly, there is no proof that Harpeth Toyota knew or should have known about the defective repairs others had made. The nature of the damage and of the repairs were such that they would not reasonably have been detected, even by a trained eye, without disassembling part of the engine. Under the facts of this case, we find that Harpeth Toyota did not have a duty to inform the Pattons that the car had been substantially rebuilt.

## IV.

The Pattons also assert that they should have recovered against Harpeth Toyota and Ford Credit based on their claim that Harpeth Toyota breached its implied warranty of merchantability in Tenn.Code Ann. § 47-2-314 (1979). In response, Harpeth Toyota asserts that it cannot be liable on this theory because it did not "sell" the car to the Pattons. We have already determined that Harpeth Toyota was the seller of the car. Therefore, all that remains to be decided on this score is whether Harpeth Toyota effectively disclaimed its implied warranties. We find that it did not.

The implied warranty of merchantability applies to the sale of used cars. *Bert Smith Oldsmobile, Inc. v. Franklin*, 400 So.2d 1235, 1236 (Fla.Dist.Ct.App.1981); *Fitzner Pontiac–Buick–Cadillac, Inc. v. Smith*, 523 So.2d 324, 327 (Miss.1988); *Wright v. T & B Auto Sales, Inc.*, 72 N.C.App. 449, 325 S.E.2d 493, 496 (1985). As with other transactions, Tenn.Code Ann. § 47-2-316 (1976) permits dealers to limit or disclaim this warranty. However, in order to be effective, the disclaimer must comply strictly with the Uniform Commercial Code, the Magnuson–Moss Act, and the FTC's used car regulations.

Tenn.Code Ann. § 47-2-316(3)(a) permits used car dealers to disclaim all implied warranties by selling the car "as is." However, the "as is" language must be conspicuous, *Board of Directors of the City of Harriman School Dist. v. Southwestern Petroleum Corp.*, 757 S.W.2d 669, 673–75 (Tenn.Ct.App.1988), and must be

---

13. *Stapinski v. Walsh Constr. Co.*, 178 Ind.App. 623, 383 N.E.2d 473, 476–77 (1978); *General Motors Corp. v. Dodson*, 47 Tenn.App. 438, 458–59, 338 S.W.2d 655, 664–65 (1960).

14. *Simmons v. Evans*, 185 Tenn. 282, 285–86, 206 S.W.2d 295, 296 (1947); Restatement (Second) of Torts § 551(2)(e) (1976); W. Keeton, *Prosser and Keeton on The Law of Torts* § 106, at 739 (5th ed.1984).

contained on a form affixed to the side window of the car. *See* 16 C.F.R. § 455.2 (1991).

■ The implied warranty of merchantability cannot be disclaimed or limited if the seller either gives the buyer a written warranty or enters into a service contract [15] with the buyer within ninety days after the sale. *See* 15 U.S.C. § 2308(a). Thus, the inclusion of an "as is" disclaimer in a contract for the sale of a car will not be effective if the dealer also sells a service contract to its customer. *Auburn Ford Lincoln Mercury, Inc. v. Norred*, 541 So.2d 1077, 1080 (Ala.1989).

■ Harpeth Toyota did not, and indeed could not, effectively disclaim the implied warranty of merchantability when it sold the car to the Pattons. The documents Harpeth Toyota prepared did not contain the "as is" disclaimer or any similar language; nor did Harpeth Toyota prepare and provide the Pattons with the required window sticker. Even if Harpeth Toyota had done so, its disclaimer of the implied warranties would have been ineffective because it also sold the Pattons a service contract for the car.[16]

#### V.

We now turn to the question of whether Harpeth Toyota breached the implied warranty of merchantability. If the warranty has not been effectively disclaimed, it assures the buyer that the goods will "pass without objection in the trade" and that they are "fit for the ordinary purposes for which such goods are used." Tenn.Code Ann. § 47–2–314(2)(a), (c) (1979).

■ Whether a particular used car is merchantable—that is fit for the ordinary purpose for which cars are used—depends on the age, mileage, condition, and price of the car. *Faulkingham v. Seacoast Subaru, Inc.*, 577 A.2d 772, 774 (Me. 1990). As the Kansas Supreme Court has noted:

A late model, low mileage car, sold at a premium price, is expected to be in far better condition and to last longer than an old, high mileage, "rough" car that is sold for little above its scrap value.

*Dale v. King Lincoln–Mercury, Inc.*, 234 Kan. 840, 676 P.2d 744, 748 (1984). To be merchantable, a used car must be in reasonably safe condition and substantially free of defects that could render it inoperable, *Thomas v. Ruddell Lease–Sales, Inc.*, 43 Wash.App. 208, 716 P.2d 911, 915 (1986), and must perform up to the level reasonably expected of a car of the same age, mileage, and price. *Faulkingham v. Seacoast Subaru, Inc.*, 577 A.2d at 774.

■ The car Harpeth Toyota sold to the Pattons had serious structural defects, including a cracked engine block and a seriously damaged unibody frame. It ceased to operate within days after its purchase through no fault of the Pattons or their family. These defects were so serious that they deprived the Pattons of the beneficial use of the car. *Ford Motor Co. v. Taylor*, 60 Tenn.App. 271, 287, 446 S.W.2d 521, 528 (1969). The car involved in this case would certainly not pass without objection in the trade and was certainly not fit for the ordinary purposes for which it was intended. Accordingly, we find that Harpeth Toyota is liable to the Pattons for breach of its implied warranty of merchantability.

#### VI.

One final issue remains. Having found that Harpeth Toyota breached the implied warranty of merchantability and violated the Magnuson–Moss Act and the FTC's

---

**15.** 15 U.S.C. § 2301(8) defines a service contract as "a contract in writing to perform, over a fixed period or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product."

**16.** That Harpeth Toyota was acting as an agent for an extended warranty company when it sold the service contract to the Pattons is of no significance insofar as 15 U.S.C. § 2308(a) is concerned. The service contract required the Pattons to obtain their service from Harpeth Toyota unless they obtained special permission to go elsewhere. There is no indication in the language or legislative history of the Magnuson–Moss Act that the service contract must originate with or be the sole responsibility of the dealer.

used car rules, we must identify the remedies available to the Pattons.

We find first that the Pattons may make the same claims and defenses against Ford Credit's claim for payment that they could have asserted against Harpeth Toyota. However, we also find that the Pattons cannot hold Ford Credit independently liable for Harpeth Toyota's breach of its implied warranty of merchantability.

Ford Credit is the assignee of the retail installment contract between Harpeth Toyota and Mr. Patton. Tenn.Code Ann. § 47-9-318(1) (Supp.1990) provides that

> Unless the account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in § 47-9-206 the rights of an assignee are subject to:
>
> (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
>
> (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

■ Mr. Patton made no such agreement. The Federal Trade Commission's rule pertaining to the preservation of consumers' claims and defenses [16 C.F.R. § 433.2 (1991)] places this transaction beyond Tenn.Code Ann. § 47-9-206(1) (1979).[17] The notice required by the rule to be included in all consumer credit contracts renders the retail installment sales contract non-negotiable. *See* 1 J. White & R. Summers, *Uniform Commercial Code* § 14-8, at 721-22 (3d ed.1988).

■ As the assignee of the retail installment sales contract, Ford Credit stood in Harpeth Toyota's shoes and had all the rights, and was subject to all the liabilities, of Harpeth Toyota. *See Personal Loan &*

*Finance Co. v. Kinnin,* 56 Tenn.App. 481, 487, 408 S.W.2d 662, 665 (1966). This does not mean, however, that the Pattons have an open-ended right to obtain affirmative relief against Ford Credit.

■ Tenn.Code Ann. § 47-9-318(1) is intended only to permit an account debtor to assert against an assignee the same defensive claims it could assert against the assignor. *Michelin Tires (Canada), Ltd. v. First Nat'l Bank,* 666 F.2d 673, 677-80 (1st Cir.1981); *Lydig Constr. Co. v. Rainier Nat'l Bank,* 40 Wash.App. 141, 697 P.2d 1019, 1021-23 (1985). It does not empower an account debtor to recover from the assignee because of the assignor's nonperformance. *Irrigation Assoc. v. First Nat'l Bank,* 773 S.W.2d 346, 350 (Tex.Ct. App.1989).

The Supreme Judicial Court of Massachusetts reached precisely this conclusion in a case involving Ford Credit. In response to a car buyer's claim that Ford Credit was liable for the car dealer's fraudulent conduct, the court found that Section 9-318(1) "has never been interpreted to mean that the assignee will be liable for the assignor's wrongs." *Ford Motor Credit Co. v. Morgan,* 404 Mass. 537, 536 N.E.2d 587, 591 (1989).

The Uniform Commercial Code permits a buyer to revoke acceptance of consumer goods if

(1) the goods contain defects that substantially impairs their value or that reasonably undermines the buyer's confidence that they will perform the function for which they were purchased;[18]

(2) the defects were not known and would have been difficult for the buyer to discover;[19] and

(3) the revocation of acceptance occurs within a reasonable time after discovery of the defect and before any

---

17. Tenn.Code Ann. § 47-9-206(1) provides, in part: "A buyer who as part of one (1) transaction signed both a negotiable instrument and a security agreement makes such an agreement."

18. Tenn.Code Ann. § 47-2-608(1) (1979); *Haverlah v. Memphis Aviation, Inc.,* 674 S.W.2d 297,

304 (Tenn.Ct.App.1984); *Phillips v. General Motors Corp.,* 669 S.W.2d 665, 668 (Tenn.Ct.App. 1984).

19. Tenn.Code Ann. § 47-2-608(1)(b).

substantial change in the goods' condition not caused by the defects.[20]

 The defects in the car substantially impaired its value and rendered it inoperative. The Pattons did not discover the defects until after they had accepted the car. They had no reason to believe that the car was defective, and indeed, they could not have discovered the defects without disassembling and inspecting the car. The defects caused the car to fail within days of the purchase, and the Pattons requested rescission of the contract immediately. Accordingly, we find that the Pattons are entitled to revoke their acceptance of the car under Tenn.Code Ann. § 47–2–608.

 Buyers who properly revoke acceptance are entitled to cancel the contract and to recover so much of the purchase price as they have paid. Tenn.Code Ann. § 47–2–711(1) (1979); *see also True v. J. B. Deeds & Sons*, 151 Tenn. 630, 635–36, 271 S.W. 41, 42 (1925); *Rundle v. Capitol Chevrolet, Inc.*, 23 Tenn.App. 151, 159, 129 S.W.2d 217, 222 (1939). They may also recover incidental damages, including expenses reasonably incurred in the inspection, receipt, transportation, and care of the rejected goods. Tenn.Code Ann. § 47–2–715 (1979).

 We find that the Pattons should have been permitted to rescind the contract. In addition, they are also entitled to a judgment against Ford Credit for the payments they made on the car, and Ford Credit is not entitled to a deficiency judgment for the unpaid balance of the loan.

 The Pattons are also entitled to a judgment against Harpeth Toyota for their other incidental expenses authorized by Tenn.Code Ann. § 47–2–715, but these damages should be reduced by any recovery the Pattons collect from Mr. McHone. Since the Magnuson–Moss Act [15 U.S.C. § 2310(d)(2) ] permits the recovery of the reasonable legal expenses incurred by consumers whose suits are successful, the Pattons are also entitled to a judgment against Harpeth Toyota for their reasonable legal expenses.

20. Tenn.Code Ann. § 47–2–608(2).

### VII.

We reverse the dismissal of the Pattons' Uniform Commercial Code and Magnuson–Moss Act claims against Harpeth Toyota and Ford Credit. We also reverse Ford Credit's deficiency judgment against the Pattons. We remand the case to the trial court to determine the amount of the Pattons' judgment against Ford Credit and Harpeth Toyota. We tax the costs in equal proportions against Harpeth Toyota and Ford Credit and their respective sureties for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.